IN THE SUPREME COURT OF TENNESSEE

AT KNOXVILLE

FILED

FOR PUBLICATION
April 19, 1999

Filed:  April 19, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

EDWARD J. EYRING,                      )
Individually and for the benefit of       )
EDWARD J. EYRING, M.D., P.C.,       )
                                                      )
            Appellant,                          )
                                                      )          KNOX CIRCUIT
                                                      )
                                                      )
Vs.                                                  )          HON. WHEELER A. ROSENBALM,
                                                      )                    JUDGE
                                                      )
                                                      )
                                                      )          No.  03-S-01-9711-CV-00134
                                                      )
FORT SANDERS PARKWEST        )
MEDICAL CENTER, INC. and          )
FORT SANDERS ALLIANCE,            )
                                                      )
            Appellees.                          )


For the Appellant:                              For Appellees:
John K. King                                        Foster D. Arnett
Alan M. Parker                                    Rick L. Powers
LEWIS, KING, KRIEG,                         Dan D. Rhea
  WALDROP & CATRON, P.C.             ARNETT, DRAPER AND HAGOOD
Knoxville, Tennessee                          Knoxville, Tennessee


For Amicus Curiae, Tennessee            For Amicus Curiae, Tennessee
Medical Association:                             Hospital Association:
Marc E. Overlock                                William B. Hubbard
Angela Washington                                   WEED, HUBBARD, BERRY
AND
TENNESSEE MEDICAL ASSOCIATION          DOUGHTY
Nashville, Tennessee                          Nashville, Tennessee


# O P I N I O N


COURT OF APPEALS

AFFIRMED                                    ANDERSON, C.J

We granted this appeal primarily to determine whether hospitals are entitled to qualified immunity from liability for damages under the Tennessee Peer Review Law, Tenn. Code Ann. § 63-6-219 (1997). Other issues include whether there was a genuine issue of material fact as to whether the hospital's actions were in good faith and without malice and on the basis of facts reasonably known or reasonably believed to exist and whether the Peer Review Law grants the hospital a privilege barring discovery of the peer review process.

The Court of Appeals affirmed the trial court's grant of summary judgment to the defendants, holding: 1) that the Peer Review Law includes hospitals in those parties entitled to qualified immunity from liability for damages; 2) that there was no genuine issue of material fact regarding whether the hospital's actions were taken in good faith and without malice and on the basis of facts reasonably known or reasonably believed to exist; and 3) that the Peer Review Law grants the hospital a privilege barring discovery of the peer review process. After our review of the record and applicable authorities, we affirm the judgment of the Court of Appeals.

**BACKGROUND**

Plaintiff Edward J. Eyring ("Eyring") is a licensed physician and board certified orthopedic surgeon. Defendants Fort Sanders Parkwest Medical Center, Inc. and Fort Sanders Alliance (collectively referred to as "Parkwest") granted Eyring medical staff privileges for a number of years prior to July 31, 1991. Shortly after his reappointment in 1991 and following the death of one of his patients, Helen Parker, Parkwest initiated disciplinary action against Eyring which eventually resulted in the revocation of his staff appointment and clinical privileges.

Eyring concedes that he is an aggressive surgeon who performs surgery on high risk patients upon whom other surgeons would not be willing to operate. He alleges, however, that Parkwest disciplined him out of malice and bad faith which he

claims to be evidenced by various deviations from Parkwest's Bylaws occurring throughout the peer review process.

## Parkwest's Bylaws

Parkwest's Bylaws required that corrective action against a physician be initiated by the Chief Executive Officer ("CEO"), the Board of Trustees (the "Board"), or the Medical Executive Committee, a medical staff committee of doctors exercising overall management functions of Parkwest's medical staff. After initiating or receiving a request for adverse action, the Medical Executive Committee forwards the request to the "chairperson of the department in which the questioned activities occurred." The Bylaws provide that the Department then either investigates the matter or appoints an Ad Hoc Committee to investigate. The investigation is to culminate in a written report within thirty days which is then forwarded to the Medical Executive Committee. If the Medical Executive Committee recommends adverse action to the Board based upon this report, the physician is entitled to prompt notice advising the physician of his right to request a hearing.

Once the physician requests a hearing, Parkwest is to provide notice of the hearing's place and time, which should be scheduled no later than thirty days from the date of the physician's request. At least seven days before the hearing, Parkwest must provide the physician with a concise statement of alleged acts or omissions. Following the hearing, appellate review should occur within seven days of the physician's request.

## Action Against Eyring

The corrective action against Eyring was initiated by the Surgical Patient Care Evaluation Committee ("Surgical Evaluation Committee"), of which Eyring was a member. After Helen Parker died at Parkwest while under Eyring's care, the Surgical Evaluation Committee had its regular meeting and discussed the Helen

Parker chart as a part of its regular agenda. Eyring was present during the discussion. The Surgical Evaluation Committee questioned Eyring's judgment in choosing to perform knee surgery on Helen Parker, who was a poor candidate for surgery because of numerous risk factors in her case, including extreme obesity. The Surgical Evaluation Committee recommended that the Helen Parker chart be "trended," a term referring to the process by which Parkwest performs quality assurance.[1] The Surgical Evaluation Committee voted to appoint a five-member Ad Hoc Committee to conduct an in-depth focused review of all of Eyring's cases trended "during the past two years," which totaled twenty-three charts including the Helen Parker chart.

Both the Department of Surgery and the Medical Executive Committee approved the Surgical Evaluation Committee's recommendations, and the Ad Hoc Committee began its focused review of Eyring's trended cases. More than thirty days later, the Ad Hoc Committee submitted to the Medical Executive Committee a two-page report, in which it unanimously concluded that Eyring had deviated from the standard of care and recommended "strong sanctions up to and including suspension." Based upon the Ad Hoc Committee's report, the Medical Executive Committee unanimously voted to recommend to the Board the revocation of Eyring's clinical privileges and medical staff appointment.

Instead of providing Eyring notice of the Medical Executive Committee's adverse action, the Board met and unanimously voted to accept the Medical Executive Committee's recommendation and to immediately terminate Eyring's medical staff appointment. The Board notified Eyring of its action, that this action constituted "adverse action," and that he was entitled to procedural rights contained in the Bylaws. However, shortly after terminating his appointment and privileges, the

---

[1] Basically, if a problem or complication arose with a particular patient, the patient's chart would be placed in the physician's file to monitor whether the problem or complication would develop into a trend or pattern.

Board apparently realized that it had made a procedural mistake and reinstated Eyring's appointment and privileges. The Board informed Eyring that the Medical Executive Committee's original recommendation to revoke his privileges and appointment was still in effect and that he was entitled to request a hearing in accordance with the Bylaws.

Approximately forty days after Eyring's request for a hearing, Parkwest provided him notice which suggested that the hearing would be held sometime the following month subject to the parties' agreement. This letter provided Eyring with the "concise statement" of his alleged acts, informing him that the Ad Hoc Committee found fault with him for three main reasons: 1) he had a high post-operative infection rate because "[n]ine (9) cases of twenty-two (22) cases which were the subject of the focused review were definitely infected;" 2) he demonstrated poor surgical technique; and 3) he exhibited poor clinical judgment.

Prior to the hearing, Eyring requested voluminous materials from Parkwest including both photocopies of the patients' charts reviewed and charts of specified patients. He also requested various other peer review documents. Though Parkwest provided a copy of the Ad Hoc Committee's two-page report, a list of patients whose charts were reviewed, and charts of specific patients as requested, Parkwest claimed that documents and materials of the Ad Hoc Committee and the Medical Executive Committee were protected by a privilege pursuant to the Peer Review Law, Tenn. Code Ann. § 63-6-219.

Pursuant to the Bylaws, the hearing was conducted before a Hearing Committee selected by Parkwest. The Hearing Committee was comprised of five physician members. Eyring, represented by a member of the medical staff in good standing, voir dired each member of the Hearing Committee extensively, presented proof, and cross-examined witnesses. An representative for the Ad Hoc Committee

read into evidence a seventeen-page Ad Hoc Committee report, a copy of which Eyring had never seen, which explained the reasons for the Ad Hoc Committee's adverse recommendation. Though the Hearing Committee did not agree with all findings of the Ad Hoc Committee, by a four-to-one vote, it issued a report to the Medical Executive Committee in which it agreed with the Ad Hoc Committee's final recommendation to suspend Eyring's clinical privileges and staff appointment.[2] The Medical Executive Committee then suspended Eyring's clinical privileges and staff appointment. Eyring then, as provided by the Bylaws, requested appellate review, which Parkwest scheduled to occur approximately eleven days from his request.

The Appellate Review Committee's report agreed that the conclusions of the Hearing Committee were supported by the evidence and that Eyring had received a fair hearing. The Appellate Review Committee unanimously recommended that the Board affirm the Medical Executive Committee's recommendation. The Board affirmed the recommendation by a unanimous vote. Consequently, the Board revoked Eyring's clinical privileges and medical staff membership.

Eyring filed suit against Parkwest in the circuit court for an aggregate of $600,000,000.00 in compensatory and punitive damages alleging breach of contract, intentional interference in contract, intentional interference in an existing business relationship, intentional interference in a prospective business expectancy, and intentional discriminatory interference in his right to engage in his profession at the hospital. Parkwest filed a Motion for Partial Summary Judgment against Eyring's claims for damages based upon the qualified immunities granted by the Federal Health Care Quality Improvement Act, 42 U.S.C. §§ 11101, et seq.

---

[2] The one member of the Ad Hoc Committee who voted against summarily suspending Eyring, agreed with all of the Hearing Committee's findings but felt that Eyring should have received a less severe penalty.

(HCQIA),[3] and by the Tennessee Peer Review Law, Tenn. Code Ann. § 63-6-219. In response, Eyring moved for discovery.

Over Parkwest's objection, the trial court initially permitted discovery of peer review participants for the limited purpose of allowing Eyring an opportunity to discover the committee members' good faith, malice, and whether they acted on the basis of facts reasonably known or believed to exist. The trial court, however, eventually sustained Parkwest's objections that Eyring was seeking privileged information about the peer review committees' deliberative processes and granted Parkwest's motion for summary judgment. The Court of Appeals affirmed the trial court's grant of summary judgment to the defendants, holding that the Tennessee Peer Review Law includes hospitals in those parties entitled to qualified immunity from liability for damages; that there was no genuine issue of material fact regarding whether the hospital's actions were taken in good faith and without malice and on the basis of facts reasonably known or reasonably believed to exist; and that the Peer Review Law grants the hospital a privilege barring discovery of the peer review process.

We granted Eyring's application for permission to appeal.

## ANALYSIS

### The Tennessee Peer Review Law of 1967

We begin our analysis of the question of whether hospitals were included in those parties to whom qualified immunity from liability was extended by examining the language of the Peer Review Law. The Tennessee Peer Review Law is codified in Tenn. Code Ann. § 63-6-219. In enacting the Peer Review Law, the Legislature has clearly stated its intent and purposes:

---

[3] The trial court, finding that the HCQIA did not preempt the more restrictive Tennessee Peer Review Law, based its decision solely on the Tennessee statute.

> it is the stated policy of Tennessee to encourage
> committees made up of Tennessee's licensed physicians
> to candidly, conscientiously, and objectively evaluate and
> review their peers' professional conduct, competence,
> and ability to practice medicine. . . . As incentive for the
> medical profession to undertake professional review, . . .
> peer review committees must be protected from liability
> for their good-faith efforts.  To this end, peer review
> committees should be granted certain immunities relating
> to their actions undertaken as part of their responsibility
> to review, discipline, and educate the profession.

Id. § -219(a)(1)-(2) (now codified at § -219(b)(1)-(2)) .

The Peer Review Law defines "peer review committee" as including "a committee of any licensed health care institution."  Id. § -219(b) (now codified at § -219(c)).  In enumerating the parties entitled to qualified immunity under the Peer Review Law, the statute states that:

> . . . <u>institutions</u>, foundations, <u>entities</u> and associated
> committees as identified in subsection (b), physicians,
> surgeons, registered nurses, hospital administrators and
> employees, members of boards of directors or trustees of
> any publicly supported or privately supported hospital or
> other such provider of health care, any person acting as
> a staff member of a medical review committee . . . <u>is</u>
> <u>immune from liability</u> to any patient, individual or
> organization for furnishing information, data, reports or
> records to any such committee or <u>for damages resulting</u>
> <u>from any decision</u>, opinions, <u>actions and proceedings</u>
> <u>rendered</u>, entered or acted upon by such committees
> undertaken or performed within the scope or function of
> the duties of such committees, <u>if made or taken in good</u>
> <u>faith and without malice and on the basis of facts</u>
> <u>reasonably known or reasonably believed to exist</u>.

Id. § -219(c)(1) (emphasis added) (now codified at § -219(d)(1)).

Eyring argues the lower courts erred in applying the Peer Review Law to grant Parkwest qualified immunity from liability for damages because the plain language of the statute provides no explicit immunity to "hospitals," and to so construe the statute would violate our duty to strictly construe statutes in derogation of the common law.  Parkwest maintains that the Peer Review Law includes "hospitals" by including "institutions" and "entities."

After having carefully considered the arguments of both parties, the Peer Review Law, and its stated policy, we conclude that the only interpretation which "give[s] effect to the intention or purpose of the legislature as expressed in the statute," e.g., Carson Creek Vacation Resorts, Inc. v. State Dep't of Revenue, 865 S.W.2d 1 (Tenn. 1993), is to construe the term "institutions" as referring to hospitals.[4] We acknowledge that hospitals lack immunity under the common law. However, Eyring's argument overlooks the fact that at common law, a hospital can only act through its agents, incurring liability only through its agents' acts and omissions. The Peer Review Law clearly grants immunity to a specific class of the hospitals' "agents," the peer review committees.[5]

Moreover, the stated purpose of the Peer Review Law indicates that the legislature balanced the interests of physicians and the public so that, essentially, persons and entities involved in the peer review process are protected from monetary liability for their actions but are still subject to suit for declaratory and injunctive relief. A plaintiff physician should not be permitted to circumvent the stated policy supporting the Peer Review Law simply by naming the hospital as a separate defendant in a suit for money damages when physicians are entitled to vindicate their rights to procedure through suits for declaratory and injunctive relief. Accordingly, affording hospitals a qualified immunity from liability for damages better serves the legislature's purpose to provide an "incentive for the medical profession to undertake professional review." Tenn. Code Ann. § 63-6-219(a)(2). For example,

---

[4] In a related issue, Eyring argues that any interpretation of the Peer Review Law which includes hospitals within its protective ambit effectively grants a hospital immunity for breach of contract contrary to our holding in Lewisburg Community Hosp. v. Alfredson, 805 S.W.2d 756 (Tenn. 1991). In our view, however, Lewisburg is readily distinguishable because there, the hospital refused to provide a hearing.

[5] Moreover, the Peer Review Law explicitly states that it is to be read "in conjunction with the applicable policies of the Health Care Quality Improvement Act of 1986, 42 U.S.C. §§ 11101-11152," Id. § -219(a)(1) (now codified at § -219(b)(1)), which is part of the pre-existing law to which the Legislature has expressly directed our attention. The immunity provisions of the HCQIA apply to protect hospitals. Cf. 42 U.S.C. §§ 11111, 11151 (HCQIA expressly extends its protections to a "professional review body," which is defined as a "health care entity," which in turn is defined as including a licensed hospital); e.g., Imperial v. Suburban Hosp. Ass'n, Inc. 862 F. Supp. 1390 (D. Md.), aff'd, 37 F.3d 1026 (4th Cir. 1993).

the legislature intended to encourage peer review committees to carry out their "responsibility to . . . discipline . . . the profession." Id. (emphasis added). Peer review committees, however, can discipline only through the hospital's disciplinary structure.

Our interpretation of the term "institutions" to include "hospitals" is in accord with a close reading of the statute in its entirety. Section -219(b) defines a "peer review committee" as including "a committee of any licensed health care institution." Id. (emphasis added). Section -219(c)(1) grants qualified immunity to "institutions . . . and associated committees as identified in subsection (b)." Id. Clearly, the phrase "licensed health care institution" in subsection (b) corresponds to the term "institutions" in subsection (c). Like the Court of Appeals, we observe that "clearer language could have been employed," but we cannot escape the conclusion that the words "licensed health care institution," and "institutions" refer to hospitals, which must be licensed by the State.[6] Tenn. Code Ann. § 68-11-204 (1996 & Supp. 1998).

## Proof of Malice

In order to determine whether there was a genuine issue of material fact as to whether the hospital's actions were in good faith and without malice, we begin by reviewing the standards applicable to summary judgment. Our review of the trial court's grant of summary judgment is purely a question of law; accordingly, our review is de novo, and no presumption of correctness attaches to the lower courts' judgments. A summary judgment is appropriate only if the moving party shows that no genuine and material factual issue exists and that he or she is entitled to relief as a matter of law. In reviewing the record to determine whether summary judgment requirements have been met, we must view the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in the nonmoving

---

[6] Moreover, the legislature has defined a "hospital" as an "institution." Tenn. Code Ann. § 68-11-201(21)(A) (1996 & Supp. 1998).

party's favor.  Byrd v. Hall, 84 S.W.2d 208, 210-11 (Tenn. 1993).  A summary judgment may be proper, therefore, only "when there is no dispute over the evidence establishing the facts that control the application of a rule of law."  Id. at 214-15; Tenn. R. Civ. P. 56.

The Peer Review Law grants qualified immunity from liability for damages for actions taken "in good faith and without malice and on the basis of facts reasonably known or reasonably believed to exist."  Tenn. Code Ann. § -219(c)(1).  Moreover, "[a] member of a medical review committee, or person reporting information to a medical review committee, is presumed to have acted in good faith and without malice.  Any person alleging lack of good faith has the burden of proving bad faith and malice."  Id. § -219(d)(3).

Eyring first argues that Parkwest should have had to prove an absence of malice in order to be entitled to summary judgment.  The relevant statutory provision states that "any person alleging lack of good faith has the burden of proving bad faith and malice."  Tenn. Code Ann. § -219(c)(3) (emphasis added).  This unambiguous statutory language clearly places the burden of proving malice and bad faith on "any person" who wants to defeat the protections afforded parties under the Peer Review Law.

Eyring next contends that he offered sufficient evidence of malice to preclude summary judgment to Parkwest.  The trial court specifically found that:

> not only are the bylaw requirements . . . not as strict or as demanding as suggested by the plaintiff, but . . . the plaintiff was notified of the general nature of the hospital's complaints prior to the hearing in question and had been advised of the names of the patients whose charts . . . had been reviewed . . . [T]he peer review committees and the hospital concluded, based upon the facts that were before them . . . that the plaintiff was too aggressive in the practice of orthopedic surgery and had exercised poor clinical judgment. . . . [P]laintiff has failed to produce sufficient evidence to create a genuine issue of material fact to the effect that the hospital, in making

> its ultimate decision to revoke the privileges of the plaintiff, was not acting in good faith and that it was possessed and motivated by malice.

(Emphasis added).

The Court of Appeals agreed, stating that "[w]e have thoroughly reviewed plaintiff's argument and the record, and conclude that there was insufficient evidence from which malice could have been inferred under the Peer Review Law." Eyring maintains in this Court that he offered the trial court sufficient proof of malice and bad faith to defeat Parkwest's summary judgment by submitting several affidavits disputing the standard of care and by cataloging Parkwest's deviations from the Bylaws. Parkwest argues that reviewing courts should not consider affidavits which were not considered by the peer review participants because such documents are irrelevant to Parkwest's knowledge or reasonable belief, and that in any event, Parkwest substantially followed its Bylaws.

To resolve these arguments, we have considered the affidavits filed by Eyring and agree with the trial court that the affidavits failed to raise a genuine issue as to Parkwest's malice, good faith and basis of knowledge and reasonable belief at the time of the hearing. Smith v. Our Lady of the Lake Hosp., 639 So.2d 730, 753 (La. 1994) ("affidavits . . . questioning the propriety of the disciplinary action do not support the allegations of bad faith and malice; they simply question the medical judgment upon which the disciplinary action was based"); Onat v. Penobscot Bay Med. Ctr., 574 A.2d 872, 874 (Me. 1990) ("[p]rofessional disagreement over the appropriate standard of care does not per se constitute malice").

Moreover, we note that there was no direct evidence of malice, and Eyring's theory requires that malice be inferred from alleged deviations from the hospital Bylaws. Eyring argues in this regard that his "due process" rights were violated, particularly his right to notice under the Bylaws. The Bylaws required Eyring's notice

-13-

to "contain a concise statement of . . . alleged acts or omissions, a list by number of the specific or representative patient records in question and/or the other reasons or subject matter forming the basis for the adverse recommendation or action which is the subject of the hearing." Eyring's "concise statement" from Parkwest alleged that:

    a.    Dr. Eyring had an unacceptable number of post-operative infections after consideration of the overall infection rate of his patients treated at the hospital. Nine (9) cases of twenty-two (22) cases which were the subject of the focused review were definitely infected when the question of infection was raised.

    b.    Dr. Eyring has had numerous cases evidencing poor surgical technique. One case involved severance of the sciatic nerve while performing a revision of a total hip. In one case, there was a severance of several ligaments of the knee during total knee replacement. In another case there was a dislocation of a hip joint after a total hip procedure. There were cases of hemovac drains being placed in the knee joint and one patient was discharged home with the drain in the joint space.

    c.    Dr. Eyring exhibits poor clinical judgment. One case reviewed involved a revision of a hip joint in a hemiplegic patient. Another case involved a fusion of a knee joint in a twenty-eight (28) year old patient with normal appearing x-rays of the knee. There were cases of bilateral and/or multiple, simultaneous procedures.

The notice further stated that:

It was the Ad hoc Committee's unanimous opinion that Dr. Eyring exhibits multiple significant deficiencies with deviations from the standard of care that should be delivered to patients. It was that committee's opinion that Dr. Eyring failed to follow accepted professional standards causing the adverse results reflected in the cases which we have just described.

This notice clearly complied with that required by the Bylaws, which are written in the disjunctive, and which only required that Eyring receive notice of his "alleged acts," "specific or representative patient records in question, and/or the other reasons or subject matter forming the basis for the adverse recommendation." Moreover, though the Board initially terminated Eyring without providing him notice of his right to a hearing, the record reflects that Parkwest quickly rectified this

deviation from the Bylaws.  The record further reflects that Parkwest provided Eyring a list of all charts considered, access to all charts, copies of requested charts, and notice which both specified the number of cases in which the Ad Hoc Committee found problems of infection and, while not specifying every problem with each reviewed chart, stated each problem and cited several case examples supporting each of the Ad Hoc Committee's concerns.  Cf. Rosenblit v. Superior Ct., 231 Cal. App. 3d 1434, 1442-49, 282 Cal. Rptr. 819, 823-27 (1991) (notice held inadequate in light of hospital's refusal to allow physician to copy medical records and hearing committee's vague findings).

Though Eyring takes issue with the Ad Hoc Committee's seventeen-page report as violating his right to notice, this report was based upon the same charts as the two-page report which Eyring had seen prior to the hearing.  Further, the Bylaws did not restrict the Hearing Committee from independently considering evidence but only required that the Hearing Committee's findings be "supported by reference to the hearing record and the other documentation considered by it."  The record indicates that both the Ad Hoc Committee and the Hearing Committee based their independent findings upon the same evidence; Eyring had access to this evidence; and the Hearing Committee had the authority under the Bylaws to make independent judgment based upon the evidence.  The Hearing Committee's exercise of that judgment does not support an inference of malice or bad faith.

Eyring makes numerous other "due process" allegations which he claims should have prevented the trial court's grant of summary judgment to Parkwest.  We do not deem it necessary to address separately each allegation, but we have considered all the allegations of malice to the extent that they suggest procedural violations affecting his right to due process.  We have carefully reviewed the voluminous record in this case, and we agree with the Court of Appeals that Eyring was provided due process; that he presented no evidence from which to reasonably

infer malice; and that he has offered only conclusory allegations unsupported by the evidence that Parkwest had an improper purpose in proceeding to revoke his privileges and appointment. Accordingly, we conclude that there was no genuine issue of material fact as to whether Parkwest's actions were in good faith and without malice and that the trial court was correct in granting summary judgment to the defendants.

### Privilege from Discovery

We now consider whether the Peer Review Law grants the hospital a privilege barring discovery of the peer review process. The trial court initially allowed Eyring an opportunity to depose peer review participants for the limited purpose of discovering whether the committees acted in good faith and without malice and on the basis of facts reasonably known or reasonably believed to exist. However, the trial court eventually sustained Parkwest's objections that Eyring was not entitled to inquire about the deliberative process of the peer review committee, its conclusions, or about the basis or reasons for its conclusions. The Court of Appeals concluded that the trial court was correct in denying Eyring "the ability to conduct discovery concerning the peer review process."

Eyring argues that the trial court erred in refusing to grant further discovery of the peer review committee members. Parkwest claims that such information is privileged under the Peer Review Law. We first examine the policy and language of the statute. The relevant portion of the Peer Review Law states the policy in Tennessee:

> that confidentiality is essential both to effective
> functioning of these peer review committees and to
> continued improvement in the care and treatment of
> patients.

Id. § -219(a)(1). In order to promote this policy, the Peer Review Law states that:

> All information, interviews, incident or other reports,
> statements, memoranda or other data furnished to any

-16-

> committee . . . and <u>any findings, conclusions or recommendations</u> resulting from the proceedings of such committee <u>are declared to be privileged</u>. The records and proceedings of any such committees are confidential . . . and <u>shall not be . . . available for court subpoena or for discovery proceedings</u>. . . . The disclosure of confidential, privileged peer review committee information . . . to the affected physician under review, does not constitute either a waiver of confidentiality or privilege.

<u>Id.</u> at § -219(d) (emphasis added) (now codified at § -219(e)). This statute creates a broad privilege from disclosure for "[a]ll information, interviews, incident or other reports, statements, memoranda or other data . . . and any findings conclusions or recommendations resulting from the [committees'] proceedings." <u>Id.</u> In our view, this broad language encompasses any and all matters related to the peer review process itself. We reject Eyring's contention that the statute grants an implicit right to any information "furnished to or resulting from the proceedings" of the peer review committees.

It appears, however, that the broad language extending the privilege from discovery must be reconciled with the statutory requirement that the plaintiff bear the burden of producing evidence of malice and bad faith. We therefore agree with the trial court's ruling allowing Eyring to conduct discovery for the limited purpose of investigating the committee members' good faith, malice, and reasonable knowledge or belief, but prohibiting any inquiry into the peer review process itself. <u>Cf.</u> <u>Alexander v. Memphis Individual Prac. Ass'n</u>, 870 S.W.2d 278 (Tenn. 1993). Accordingly, we conclude that the trial court was correct and that the broad language of the statute encompasses any and all matters related to the peer review process.

## CONCLUSION

We have determined that the Peer Review Law grants hospitals both a qualified immunity from liability for damages and a privilege from discovery of the

peer review process. We have also determined that there was no genuine issue of material fact on the question of the hospital's malice, good faith, and reasonable knowledge and belief. Accordingly, we affirm the Court of Appeals' judgment that the trial court correctly granted the defendants' motion for summary judgment. Costs of this appeal are taxed to the plaintiff.

_____
RILEY ANDERSON, CHIEFJUSTICE

**CONCUR:**

Drowota, Birch, Holder, and Barker, JJ.