Robert H. MEYERS, M.D. and Mary Meyers, M.D., Plaintiffs,

v.

LOGAN MEMORIAL HOSPITAL, et al., Defendants.

No. CIV.A. 1:97–CV–219–M.

United States District Court,
W.D. Kentucky,
Bowling Green Division.

Jan. 27, 2000.

---

Joseph C. Souza, Gardner, Ewing & Souza, Louisville, Matthew Meyers, Teaneck, NJ, for Robert H. Meyers, M.D., Individually and as a partnership, Mary Meyers, M.D., individually and as a partnership, plaintiffs.

Charles J. Cronan, IV, Martha J Hasselbacher, Brenda J. Runner, Stites & Harbison, Louisville, John R. Grise, Kerrick, Grise & Stivers, Bowling Green, John Baird, Greenville, for Columbia/Hca Health Care Corporation, Health Trust, Inc., The Hospital Company, Columbia Healthcare Corporation, Hca–Hospital Corporation of America, Chos Acquisition Company, Columbia Logan Memorial Hospital, Inc., Kentucky Emergency Room Physicians, Inc., Logan Memorial Board of Trustees, James Dodson, Dr., Patrick Hayden, Dr., Jitendra Pathak, Dr., Alvin Galuten, Dr., Roy McEndre, Dr., Karen Northern, Dr., Ellen Taylor, Dr., Lewis Martin, Dr., Kunja Pathak, Dr., Jeff Manley, Kirk Pogue, Suzanne Boles, Virginia Wood, Randi Danks, Brenda Duffey, Carolyn Spencer, Melanie Wilson, Bill Paxton, Fred Greene, Mike Robbins, Thomas A. Luckett, Paul N. Kerr, D.M.D., Fred Mudge, Robert L. Kirkpatrick, Jr., Dewey E. Wood, M.D., Lee Robey, Thomas L. Hayes, Unknown Defendants, defendants.

## MEMORANDUM OPINION AND ORDER

McKINLEY, District Judge.

This matter is before the Court upon Motion for Summary Judgment filed by all Defendants (hereinafter the LMH Defendants), except Ellen Taylor, M.D. and Kentucky Emergency Room Physicians, Inc. Having been fully briefed, the matter now stands ripe for decision. For the reasons discussed below, the LMH Defendants' Motion for Summary Judgment is **GRANTED.**

### STANDARD OF REVIEW

In order to grant a motion for summary judgment, the Court must find that the pleadings, together with the depositions, interrogatories and affidavits, establish that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56. The moving party bears the initial burden of specifying the basis for its motion and of identifying that portion of the record which demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party is required to do more than simply show that there is some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Co.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The Rule requires the non-moving party to present "*specific facts* showing there is a *genuine* issue for trial." Fed.R.Civ.P. 56(e) (emphasis added). Moreover, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505.

### STATEMENT OF FACTS

The Plaintiffs in this action are Dr. Robert H. Meyers (hereinafter Dr. Meyers) and his wife, Dr. Mary Meyers. The Plaintiffs brought this action against Logan Memorial Hospital, Inc. (hereinafter LMH), its corporate owners and shareholders, individual trustees, several physicians and laymen involved in the professional review of Dr. Meyers, and several nurses.

On March 25, 1991, Dr. Meyers applied for medical staff privileges at LMH in Russellville, Kentucky. Shortly thereafter, the Credentials Committee and the Medical Executive Committee (hereinafter MEC) approved Dr. Meyers for staff privileges. As a result, in September 1991, the LMH Board of Trustees (hereinafter the Board) approved Dr. Meyers for appointment to the medical staff. Pursuant to LMH Bylaws, all initial appointments to the medical staff were provisional for one year. At the end of that year the physician would be reevaluated to qualify for advancement from associate to active member status.

In the fall of 1992, the Credentials Committee began to evaluate Dr. Meyers for his advancement to active staff privileges. On April 12, 1993, the Credentials Committee, which Dr. Meyers argues was composed largely of his competitors, voted to deny staff privileges. In its decision, the committee cited concerns about Dr. Meyers' history of moving from hospital to hospital following disputes with hospital staff,[1] his failure to timely and fully dis-

---

1. Dr. Meyers had privileges from 1981–1982 at The Memorial Hospital in North Conway, New Hampshire, but maintains that he was forced to leave due to "political dynamics" upon establishing his "large, successful practice." Dr. Meyers then worked as a trauma surgeon from 1983–1984 in Fort Bragg, North Carolina. From 1984–1988, Dr. Meyers practiced in Spruce Pine, North Carolina until he got "burned out." In 1988, Dr. Meyers moved to Wytheville, Virginia, and practiced at Wythe County Community Hospital

close disciplinary and corrective action taken against him while working in Virginia,[2] and the quality of his patient care. At this point, pursuant to LMH Bylaws, the Credentials Committee was to notify Dr. Meyers of the general nature of its concerns and set up a meeting with Dr. Meyers. The Credentials Committee did, on short notice, invite Dr. Meyers to a meeting. According to Fred Mudge, a member of the Board, this invitation did not comply with the Bylaws.

On June 3, 1993, the MEC, half of whose members were also members of the Credentials Committee, voted to accept the Credentials Committee decision and revoke Dr. Meyers' staff privileges. It should be noted that neither of these committees had the power to grant or deny privileges to Dr. Meyers. The MEC was to consider the recommendation from the Credentials Committee and make a recommendation to the Board, which had the ultimate authority to grant, deny, or terminate Dr. Meyers' privileges.

On January 24, 1994, the Board informed Dr. Meyers that it was assuming full responsibility for determining his reappointment and advancement to active staff because of concerns with the manner in which the peer review process was being handled. Three members of the Board, acting as a Credentials Committee, conducted an independent review. This committee discussed concerns about Dr. Meyers' behavior and inability to get along with others in addition to questions about his surgical technique. The committee gave Dr. Meyers the opportunity to put forth additional information, but he maintained that there was none. The committee questioned Dr. Meyers about several incident reports concerning disruptive behavior, his history of problems at other hospitals, his failure to timely complete medical records, his hostility towards the operation room staff, reports of breaking the sterile field, and his failure to provide appropriate coverage for patients while he was out of town. Dr. Meyers acknowledged that he had a personality problem.

At the same time, the Kentucky Cabinet for Human Resources Drug Control Division was investigating Dr. Meyers' prescription practices pursuant to complaints from pharmacists and the Kentucky State Police about the volume of prescriptions he wrote for controlled substances. The investigation concluded that "Dr. Meyers may not have used good judgment in prescribing controlled substances to all of his patients." The Kentucky Board of Medical Licensure recommended that Dr. Meyers attend a University of Kentucky mini-residency course in prescribing controlled substances.

On March 18, 1994, this three member committee of the Board voted to deny Dr. Meyers' appointment to active staff. The reasons cited for the committee's decision were Dr. Meyers' failure to satisfy requirements that he meet LMH's standard of care, abide by the ethics of the profession,

(WCCH). He was suspended from WCCH in July 1989. Dr. Meyers was later reinstated to the WCCH staff but took a leave of absence and voluntarily left the hospital. Dr. Meyers then obtained provisional privileges in 1990 at Clark Regional Medical Center (CRMC) in Winchester, Kentucky. Dr. Meyers alleges that he left CRMC because his plan to reestablish the practice of a departed orthopedic surgeon was sabotaged by a group of Lexington physicians. On the other hand, a letter from CRMC's administrator suggests that Dr. Meyers left because he did not work harmoniously with other members of the hospital staff. The administrator also noted that he did not maintain medical records in accordance with staff rules and regulations.

2. Dr. Meyers had been censured and placed under a corrective action plan (CAP) by the Medical Society of Virginia Review Organization (MSVRO) for medical record keeping. Dr. Meyers argues that he completed the CAP and his license was in no way affected by the MSVRO. Defendants maintain that he failed to disclose this information by answering "no" to the following questions on his initial application: Has your license to practice medicine in any jurisdiction ever been limited, suspended or revoked? and Have you ever been denied membership or renewal thereof, or been subject to disciplinary action in any medical organization?

work cooperatively with others, and timely complete medical records. The committee outlined Dr. Meyers' pattern of rude, abusive, and disruptive behavior which included, but was not limited to, temper tantrums, repeated refusal to limit elective cases to time periods routinely reserved for him, attempted interference with the right of an attending physician to refer a patient to the surgeon of his choice or to transfer the patient, condescending remarks toward women, refusal to speak to a member of his surgical team during surgical procedures, and several instances of throwing a scalpel during surgery. The committee informed Dr. Meyers that "[t]his behavior can have an adverse effect on the quality of patient care by inhibiting the ability of hospital personnel to perform optimally, by making it difficult for the hospital to retain qualified personnel, and by interfering with the judgment of referring physicians. It can also disrupt the efficient operation of the hospital and the smooth operation of the surgical department to the detriment of the medical staff, the hospital, and the community." As for his failure to timely complete medical records, the committee stated that "[d]elinquent medical records can put patients at risk by being inaccurate or incomplete if needed to assist in later diagnosis and treatment of a patient." As for quality of care, the committee noted that Dr. Meyers had failed to comply with LMH's policy of obtaining post-operative films and that he had demonstrated repeated instances of violating the sterile field.

At this point, the Board began proceedings under the Medical Staff Bylaws Fair Hearing Plan § 2.3–2 which provides that "[a] hearing occasioned by an adverse action of the Trustees pursuant to § 1.2(b) or (c) shall be conducted by a hearing committee appointed by the Chairman of the Trustees and composed of five persons. At least three Medical Staff members shall be included on this committee when feasible." The Fair Hearing Committee was composed of Bill Paxton, a retired court of appeals judge; Fred Greene, a practicing attorney; Mike Robbins, a bank president;

Thomas Luckett, an industrialist; and Paul Kerr, a licensed dentist. The Board notified Dr. Meyers and explained that it was not feasible to have members of the medical staff on the Fair Hearing Committee. This committee met on eleven occasions. Dr. Meyers was represented by counsel, given the opportunity to present witnesses, affidavits, and other documentary evidence, and given the right to confront, examine, and cross-examine witnesses presented by LMH.

In April 1995, the Fair Hearing Committee issued its report and recommendation that LMH not appoint Dr. Meyers to its staff because of his failure to meet LMH's ethical standards and his inability to work cooperatively with others. In May, the Board adopted and affirmed the Fair Hearing Committee's recommendation. The Board informed Dr. Meyers of its decision and his right to appeal. Dr. Meyers appealed the Board's decision and was again represented by counsel. On August 9, 1995, the Board informed Dr. Meyers of its vote to affirm the decision denying clinical privileges to Dr. Meyers. This was the Board's final decision and Dr. Meyers' privileges were revoked.

On August 22, 1995, Dr. Meyers brought suit in Logan Circuit Court seeking a restraining order and a temporary and permanent injunction to require LMH to reinstate his staff privileges and to enjoin LMH from making a report to the National Practitioner Data Bank. The court granted the restraining order and temporary injunction but denied the motion for an injunction which would require LMH to reinstate Dr. Meyers' privileges.

On August 8, 1996, Dr. Meyers filed a second suit in Logan Circuit Court with numerous causes of action against thirty-four defendants. The Defendants moved for summary judgment based on immunity pursuant to KRS 311.377(1). The court denied that motion.

On November 5, 1997, Dr. Meyers filed suit in the U.S. District Court for the Western District of Kentucky based upon

the claims from his state court action plus claims under the Sherman Act, COBRA, and EMTALA.

## DISCUSSION

The LMH Defendants move for summary judgment on the basis of immunity under the Health Care Quality Improvement Act of 1986 (HCQIA). Congress passed the HCQIA in order (1) to provide for effective peer review and state-to-state monitoring of incompetent physicians and (2) to grant qualified immunity from damages for those who participate in peer review activities. *Johnson v. Greater Southeast Community Hosp. Corp.*, No. Civ.A. 90–1992, 1996 WL 377147, at *4 (D.D.C. June 24, 1996) (citing 42 U.S.C. § 11101). Pursuant to the HCQIA, if a "professional review action" satisfies certain requirements, then those persons participating in the review "shall not be liable in damages under any law of the United States or of any State (or political subdivision thereof) with respect to the action." 42 U.S.C. § 11111(a)(1).

The HCQIA defines the term "professional review action" to mean

an action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges, or membership in a professional society, of the physician.

42 U.S.C. § 11151(9). On the other hand, "professional review activity" is "an activity of a health care entity with respect to an individual physician—

(A) to determine whether the physician may have clinical privileges with respect to, or membership in, the entity,

(B) to determine the scope or conditions of such privileges or membership, or

© to change or modify such privileges or membership."

*Id.* § 11151(10).

Specifically, to qualify for immunity under the HCQIA, a "professional review action" must be taken:

(1) in the reasonable belief that the action was in furtherance of quality health care,

(2) after a reasonable effort to obtain the facts of the matter,

(3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and

(4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

A professional review action shall be presumed to have met the preceding standards necessary for the protection set out in section 11111(a) of this title unless the presumption is rebutted by a preponderance of the evidence.

42 U.S.C. § 11112(a). This rebuttable presumption "creates an unusual summary judgment standard" that can best be stated as follows: "Might a reasonable jury, viewing the facts in the best light for [the plaintiff], conclude that he has shown, by a preponderance of the evidence, that the defendants' actions are outside the scope of § 11112(a)?" *Bryan v. James E. Holmes Reg'l Med. Ctr.*, 33 F.3d 1318, 1333 (11th Cir.1994) (quoting *Austin v. McNamara*, 979 F.2d 728, 734 (9th Cir.1992)).

The HCQIA offers this protection to:

(A) the professional review body,

(B) any person acting as a member or staff to the body,

(C) any person under a contract or other formal agreement with the body, and

(D) any person who participates with or assists the body with respect to the action.

42 U.S.C. § 11111(a)(1). The term "professional review body" includes a "health

care entity and the governing body or any committee of a health care entity which conducts professional review activity." *Id.* § 11151(11). A "health care entity" includes "a hospital that is licensed to provide health care services by the State in which it is located." *Id.* § 11151(4)(A)(I).

Applying these definitions, it is clear that the LMH Defendants all fall within the protected categories listed in § 11111(a)(1) of the HCQIA. As a "health care entity," LMH is a "professional review body" covered under § 11111(a)(1)(A). The individual doctors are covered under § 11111(a)(1)(B)-(D), as either persons acting as members or staff to LMH, persons under a contract or formal agreement with LMH, or persons who participated with or assisted in the professional review process.

■ Regarding the members of the Fair Hearing Committee, Dr. Meyers contends that the laymen comprising the Fair Hearing Committee do not quality for immunity because the purpose of the HCQIA "is to encourage physicians to participate in peer review by granting them conditional immunity." He notes that although the Fair Hearing Committee was not comprised of physicians, its members seek the protection of the HCQIA's immunity. Nevertheless, the Court can find no provision of the HCQIA which requires the professional review process to be conducted by physicians only. In fact, the language of the HCQIA uses the word "person" rather than "physician" to describe those who will be granted immunity. 42 U.S.C. § 11111(a)(1)(B)-(D). Furthermore, under the HCQIA, a hearing may be conducted by an arbitrator, hearing officer, or panel of individuals, which contemplates the use of non-physicians in the professional review process. *Id.* § 11112(b)(3)(A)(I)-(iii). Thus, the Court concludes that each of the Defendants asserting HCQIA immunity, including the members of the Fair Hearing Committee, is a person or entity entitled to summary judgment provided that all of the requirements of the HCQIA are satisfied.

Next, the Court must decide which of the actions leading up to this lawsuit constitutes a "professional review action." The LMH Defendants contend that only the LMH Board's August 1995 vote to deny Dr. Meyers' application for reappointment to the medical staff is a "professional review action." They argue that to receive immunity, only this action must satisfy the four requirements set forth in § 11112(a). On the other hand, Dr. Meyers argues that "professional review activity" is not irrelevant. He maintains that the LMH Defendants' entire course of conduct is subject to evaluation and must meet the standards set out in § 11112(a).

■ In *Fobbs v. Holy Cross Health System Corp.*, the district court was confronted with the question of "for what does the HCQIA provide immunity?" 789 F.Supp. 1054, 1065 (E.D.Cal.1992). The court's response was that

> [t]he HCQIA provides immunity for discrete professional review actions/decisions which meet particular standards, i.e., reasonable belief that the action furthered quality health care, fact gathering, notice and hearing, and a resulting reasonable belief that the action taken was warranted. The HCQIA does not require that a professional review body's entire course of investigative conduct meet particular standards in order for it to be immune from liability for its ultimate decision.

*Id.* Similarly, the court in *Mathews v. Lancaster General Hospital* found that efforts to obtain the facts should be treated "as 'professional review activity,' which is not separately subject to the strictures of section 11112(a)." 883 F.Supp. 1016, 1028 (E.D.Pa.1995). Instead, the court held that "[a] decision, or 'professional review action,' is evaluated under section 11112(a) to determine whether the 'professional review activity' preceding it amounts to a 'reasonable' effort to obtain the facts and provides 'reasonable' substantive justification for the decision made." *Id.* Therefore, the Court holds that only the LMH

Board's August 1995 vote is a "professional review action." All other actions constitute "professional review activity" and as such are not subject to separate scrutiny under § 11112(a).

The Court will now discuss each of the four standards of § 11112(a) to determine whether the revocation of Dr. Meyers' privileges met the HCQIA requirements.

The first element of the immunity test—that a professional review action be taken in the reasonable belief that the action was in the furtherance of quality health care—can be satisfied "if the reviewers, with the information available to them at the time of the professional review action, would reasonably have concluded that their action would restrict incompetent behavior or would protect patients." *Bryan*, 33 F.3d at 1334–35 (quoting H.R.Rep. No. 903, at 10, *reprinted in* 1986 U.S.S.C.A.N. at 6393). Dr. Meyers argues that a reasonable jury could find that the action was not taken in the furtherance of health care.

In support of this statement, Dr. Meyers maintains that every expert who reviewed his charts—specifically, a radiologist and an orthopedic surgeon from Vanderbilt University and an orthopedic surgeon from the University of Louisville—believed that Dr. Meyers should receive his privileges. He further charges that the LMH Defendants' argument that his disruptive behavior adversely affected patient care has no merit because no nurses testified that they could not work with him, no nurses quit, and no patients were injured. On the other hand, the LMH Defendants contend that the decision to deny Dr. Meyers' application for reappointment was based upon things such as Dr. Meyers' temper, his delinquent medical records, and his inability to work cooperatively with others, which goes to quality of care.

The Court agrees with the LMH Defendants that the behavior of Dr. Meyers had the potential of affecting the health and welfare of patients, despite the fact that no patients were actually injured. "[Q]uality patient care demands that doctors possess at least a reasonable 'ability to work with others.'" *Rooney v. Medical Ctr. Hosp.*, No. C2–91–1100, 1994 WL 854372, at *3 (S.D.Ohio March 30, 1994) (quoting *Everhart v. Jefferson Parish Hosp.*, 757 F.2d 1567, 1573 (5th Cir.1985)). Moreover, in *Bryan*, the defendants terminated the privileges of a doctor who, although acknowledged to be an excellent surgeon, had a volcanic temper and was difficult to work with. 33 F.3d at 1324. The court held that these defendants were entitled to immunity under the HCQIA despite the plaintiff's argument that the decision was motivated primarily by personal animosity rather than by concern for patient care. *Id.* at 1335. The court found that the defendants' position that plaintiff's presence in the operating room and in patients' rooms "was disruptive and interfered with the important work of other employees" constituted a reasonable belief that the disciplinary action would further quality patient care. *Id.*

Clearly, the LMH Defendants were acting with a reasonable belief that the professional review action was in the furtherance of quality health care. They were concerned that Dr. Meyers' behavior would continue until a patient was injured as a result of his actions. However, LMH did not have to wait until a patient was injured or a nurse refused to work with Dr. Meyers. Its concerns for quality health care were reasonable and legitimate. Consequently, Dr. Meyers has failed to produce evidence to overcome the presumption in favor of the LMH Defendants.

Next, Dr. Meyers argues that a reasonable jury could find that there was not a reasonable effort to obtain the facts of the matter. In support of this statement, he points to flaws in the fact-finding process, specifically that there were no physicians on the Fair Hearing Committee, that there was an overlap among members of the Credentials Committee and the MEC, and that some of the committee members were competitors.

Nevertheless, these challenges to the fact-finding process do not rebut the pre-

sumption that the LMH Defendants engaged in a reasonable effort to obtain the facts. "The relevant inquiry under § 11112(a)(2) is whether the totality of the process leading up to the Board's 'professional review action' ... evidenced a reasonable effort to obtain the facts of the matter." *Mathews v. Lancaster General Hosp.*, 87 F.3d 624, 637 (3d Cir.1996). LMH subjected its concerns regarding Dr. Meyers to an exhaustive review process. This process began with a review by the Credentials Committee followed by the MEC's review. Due to concerns about the manner in which the process was being conducted, the Board took over responsibility and appointed a three-person committee made up of Board members to conduct an independent investigation of Dr. Meyers. This committee questioned Dr. Meyers about his history at other hospitals and about his current problems at LMH. The committee also gave Dr. Meyers the opportunity to provide them with additional information. After the Board, based upon this committee's report and recommendation, voted to deny Dr. Meyers' appointment to active staff, the Fair Hearing Committee was formed. The Fair Hearing Committee met on eleven occasions and heard testimony from thirty-five witnesses. Based upon the information received at these hearings, the Fair Hearing Committee issued a report and recommendation. Accordingly, the Court finds that Dr. Meyers has failed to rebut the presumption that the professional review action was taken after a reasonable effort to obtain the facts.

Likewise, Dr. Meyers argues that a reasonable jury could find that the LMH Defendants did not provide him with adequate notice and hearing procedures or other procedures as are fair under the circumstances. His main contention is that the Board did not comply with LMH Bylaws when it appointed five non-physicians to the Fair Hearing Committee. According to Dr. Meyers, the initial adverse decision by the MEC should have triggered § 2.3–1 of the Bylaws Fair Hearing Plan. As such, he was entitled to a hearing before a committee composed of five members of the medical staff. Instead, the Board took over the process and the adverse decision of the Board-appointed committee triggered § 2.3–2. This provision entitled Dr. Meyers to a hearing before a committee comprised of five persons with at least three of those persons being members of the medical staff when feasible. The LMH Defendants point out that the Bylaws do not require that the Fair Hearing Committee be composed of physicians only. Rather, the Bylaws call for three members of the committee to be physicians *when feasible.*

Contrary to Dr. Meyers' proposition, "there is no statutory requirement set forth in the HCQIA that a peer review proceeding must be conducted in accordance with ... a hospital's own specific internal bylaws or procedures." *Johnson,* 1996 WL 377147, at *5. Instead, "the ultimate test for determining whether defendants are entitled to a grant of qualified immunity under the HCQIA is whether the hospital procedures met the standards set forth in the statute." *Id.* at *5 n. 5. Furthermore, there is no statutory requirement set forth in the HCQIA that professional review activity or actions must be conducted by physicians. In fact, several sections of the statute contemplate the use of non-physicians in the process. *See* §§ 11111(a)(1)(B)-(D), 11112(b)(3)(A)(I)-(iii). Therefore, the Court finds that the fact that the Fair Hearing Committee was not composed of physicians does not mean that Dr. Meyers did not receive adequate notice and hearing procedures.

Basically, § 11112(b) provides the conditions which a health care entity must meet to provide adequate notice and hearing. Dr. Meyers was always given notice of a committee's decision. Also, he was always given notice of the hearings. Furthermore, at the Fair Hearing Committee proceedings, Dr. Meyers was represented by counsel, had the opportunity to call, examine, and cross-examine witnesses, and had the opportunity to present affidavits and other documentary evidence. When the Board adopted the Fair Hearing Commit-

tee's recommendation against appointing Dr. Meyers to active staff, the Board notified him of the decision and his right to appeal. The Court concludes that no reasonable jury could find that the LMH Defendants did not afford Dr. Meyers adequate notice and hearing procedures.

Additionally, Dr. Meyers argues that a reasonable jury could find that the action was not warranted by the facts. Dr. Meyers' arguments concerning the fourth element of HCQIA immunity are brief. Drawing from his argument regarding the first element, it seems that Dr. Meyers contends that because experts opined that he should receive active staff privileges, LMH's decision was not warranted by the facts. He also charges that the decision was based on insufficient facts.

The "HCQIA clearly grants broad discretion to hospital boards with regard to staff privileges decisions. Accordingly, as in all procedural due process cases, the role of federal courts 'on review of such actions is not to substitute our judgment for that of the hospital's governing board or to reweigh the evidence regarding the renewal or termination of medical staff privileges.'" *Bryan*, 33 F.3d at 1337 (quoting *Shahawy v. Harrison*, 875 F.2d 1529, 1533 (11th Cir.1989)). The arguments advanced by Dr. Meyers before the Court were asserted to the committees during the professional review process. Dr. Meyers is asking this Court to substitute its judgment for that of the LMH Board. That is not the role of the Court in this instance. The record demonstrates Dr. Meyers' history of problems at other hospitals, his behavioral problems at LMH, and his repeated failure to timely complete medical records. Based upon this information, LMH was warranted in denying Dr. Meyers' active staff privileges. LMH did not have to wait to take action against Dr. Meyers, as he seems to suggest, until a nurse quit or a patient was injured as a result of his behavior. Thus, the Court finds that Dr. Meyers has failed to present sufficient evidence to rebut the presumption that the LMH Defendants satisfied the requirement of § 11112(a)(4).

Also, Dr. Meyers argues that bad faith and the anti-competitive motive of the LMH Defendants preclude them from summary judgment based upon HCQIA immunity. However, Dr. Meyers' allegations of bad faith and anti-competitive motive are irrelevant to the reasonableness requirements of § 11112(a). *See Bryan*, 33 F.3d at 1335. "The test is an objective one, so bad faith is immaterial. The real issue is the sufficiency of the basis for the [Hospital's] actions." *Id.* (quoting *Austin*, 979 F.2d at 734).

Lastly, Dr. Meyers argues that the LMH Defendants are not entitled to immunity because of the report they sent to the National Practitioner Data Bank. The HCQIA requires that "[e]ach health care entity which takes a professional review action that adversely affects the clinical privileges of a physician for a period longer than 30 days shall report to the Board of Medical Examiners ... the information described in paragraph (3)." 42 U.S.C. § 11133(a)(1)(A). The health care entity must report the name of the physician, the reasons for the action, and any other information concerning the circumstances of the action. *Id.* § 11133(a)(3)(A)-(C). Furthermore, the HCQIA "confers immunity on any person who makes a report to the National Practitioner Data Bank 'without knowledge of the falsity of the information contained in the report.'" *Brown v. Presbyterian Healthcare Servs.*, 101 F.3d 1324, 1334 (10th Cir.1996) (quoting 42 U.S.C. § 11137(c)). Therefore, the LMH Defendants are entitled to immunity for reporting unless there is sufficient evidence for a jury to conclude that the report was false and the reporting party knew it was false. *See id.*

■ Dr. Meyers charges that the LMH Defendants violated an *ex parte* restraining order issued by the Logan Circuit Court forbidding them to report their findings to the Data Bank. Also, he contends that as a result of the alleged transgressions in the professional review process, there is sufficient evidence for a jury to

conclude that the report was false and that the LMH Defendants knew it was false. In response, the LMH Defendants maintain that Dr. Meyers has failed to present any evidence that the statements made to the Data Bank were false, much less that the LMH Defendants knew they were false. The Court agrees with the LMH Defendants and finds that they are entitled to immunity. Dr. Meyers' allegations that the report was false and the LMH Defendants knew it false are not supported by any evidence besides Dr. Meyers' conclusion that the manner in which the proceedings were conducted would lead a jury to conclude that the report was false and the LMH Defendants knew it was false.

In sum, the Court finds that Dr. Meyers failed to present sufficient evidence to rebut the presumption that the LMH Defendants complied with the requirements of § 11112(a). Accordingly, the Court holds that the LMH Defendants are entitled to immunity under the HCQIA.

For the foregoing reasons, **IT IS HEREBY ORDERED** that the Logan Memorial Hospital Defendants' Motion for Summary Judgment is **GRANTED.**