Richard R. PEYTON, M.D.,

v.

JOHNSON CITY MEDICAL CENTER.

Court of Appeals of Tennessee,
at Knoxville.

August 22, 2002 Session.

Oct. 29, 2002.

Permission to Appeal Denied by
Supreme Court March 10, 2003.

Howell H. Sherrod, Johnson City, Tennessee, for the Appellant Richard R. Peyton, M.D.

Ronald T. Hill, Knoxville, Tennessee, for the Appellee Johnson City Medical Center.

William B. Hubbard, Robyn E. Smith, William L. Penny, Nashville, Tennessee,

for Amici Curiae Tennessee Hospital Association and Hospital Alliance of Tennessee.

Andrew Yarnell Beatty, Nashville, Tennessee, for Amici Curiae, Tennessee Medical Association and American College of Radiology.

Thomas C. Jessee, Johnson City, Tennessee, Andrew L. Schlafly, Far Hills, New Jersey, for Amicus Curiae The Association of American Physicians and Surgeons.

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HOUSTON M. GODDARD, P.J., and HERSCHEL P. FRANKS, J., joined.

## OPINION

D. MICHAEL SWINEY, J.

In April of 1994, Johnson City Medical Center (the "Hospital") summarily suspended the hospital privileges of Dr. Richard R. Peyton ("Dr.Peyton"). Dr. Peyton was told the reason for this action and about his right to request a hearing. Dr. Peyton requested a hearing, which took place over three days and in which 18 witnesses testified. After the hearing, the decision to revoke Dr. Peyton's hospital privileges was upheld by the hearing panel. Dr. Peyton appealed this decision, all to no avail, through the Hospital's internal appeal procedures. Dr. Peyton then filed suit claiming his hospital privileges were improperly revoked and sought injunctive relief and monetary damages in the amount of ten million dollars. The Trial Court granted the Hospital's motion for partial summary judgment pursuant to the federal Health Care Quality Improvement Act of 1986, 42 U.S.C. § 11101, *et seq.* This decision effectively prevented Dr. Peyton from receiving any monetary damages. Dr. Peyton appeals the granting of partial summary judgment. We affirm.

This lawsuit arises out of the Hospital's permanent revocation of Dr. Peyton's privileges to practice medicine at the Hospital. The issues on appeal surround the Trial Court's granting of partial summary judgment to the Hospital after concluding the Hospital was immune from monetary damages pursuant to the federal Health Care Quality Improvement Act of 1986 ("Act"), 42 U.S.C. § 11101, *et seq.*[1] This Act was passed in an attempt to address several Congressional findings which were:

(1) The increasing occurrence of medical malpractice and the need to improve the quality of medical care have become nationwide problems that warrant greater efforts than those that can be undertaken by any individual State.

(2) There is a national need to restrict the ability of incompetent physicians to move from State to State without disclosure or discovery of the physician's previous damaging or incompetent performance.

(3) This nationwide problem can be remedied through effective professional peer review.

(4) The threat of private money damage liability under Federal laws, including treble damage liability under Federal antitrust law, unreasonably discourages

---

1. This case involves a partial summary judgment made appealable under Tenn. R. Civ. P. 54.02. The relevant portions of the Act provide for immunity from monetary damages but *do not prohibit other actions, such as a* claim for injunctive relief. Dr. Peyton's request for injunctive relief arising from his loss of hospital privileges has not been ruled upon by the Trial Court. It is important to note the only issues on appeal involve the granting of partial summary judgment. We express no opinion whatsoever on any other issues yet to be decided by the Trial Court, such as whether or not Dr. Peyton is entitled to injunctive relief.

physicians from participating in effective professional peer review.

(5) There is an overriding national need to provide incentive and protection for physicians engaging in effective professional peer review.

42 U.S.C. § 11101.

The Act creates a limitation on monetary damages for professional review actions. As a general rule, if a "professional review action" of a "professional review body" meets the standards specified in 42 U.S.C. § 11112(a), then there shall be no monetary liability "under any law of the United States or of any State (or political subdivision thereof) with respect to the" professional review action.[2]  42 U.S.C. § 11111(a)(1). This immunity from monetary liability extends to: (a) the professional review body; (b) any person acting as a member or staff to the body; (c) any person under a contract or other formal agreement with the body; and (d) any person who participates with or assists the body with respect to the action.  42 U.S.C. § 11111(a)(1)(A)-(D). To be immune from monetary liability, a professional review action must be taken:

(1) in the reasonable belief that the action was in the furtherance of quality health care;

(2) after a reasonable effort to obtain the facts of the matter;

(3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances; and

(4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3). . . .

42 U.S.C. § 11112(a). The statute further provides that a professional review action shall be "presumed" to have met the preceding standards necessary for the protection set out in 42 U.S.C. § 11111(a), unless this presumption is rebutted by a preponderance of the evidence.  *Id.*

Dr. Peyton first learned the Hospital had suspended his medical privileges on April 29, 1994, when he received a letter informing him the Hospital's Executive Committee had moved to suspend his medical privileges immediately for disregarding radiation safety procedures and policies, providing substandard quality of care, and engaging in disruptive behavior. Dr. Peyton was informed that before this action became final, he was entitled to request a hearing and the procedure for doing so was detailed in the letter. Dr. Peyton also was notified of his rights at such a hearing, including, *inter alia,* his right to counsel, to have a record made of the proceedings, to examine and cross-examine witnesses, and to present relevant evidence regardless of its admissibility in a court of law, etc.

Dr. Peyton requested a hearing, which took place on June 15th through 17th of 1994. The members of the Fair Hearing Panel were Dr. Boyce Berry, Dr. Brent Coyle, Dr. Don Clemons, Dr. John Wilson[3], Dr. Ricky Mohon, Mr. Joe Johns, Mr. Don Jeanes, and Ms. Marion McKinney. The

---

2.  There are certain exceptions to this immunity which are not applicable in the present case, such as claims pursuant to the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* *See* 42 U.S.C. § 11111(a)(1).

3.  At the beginning of the hearing, Dr. Wilson announced that Dr. Peyton had treated his

father and he (i.e., Dr. Wilson) was very impressed with the treatment his father had received. He then informed counsel he may be biased in Dr. Peyton's favor. Dr. Wilson was, nevertheless, allowed to remain on the Panel.

Hospital and Dr. Peyton each had two attorneys present.

The first witness was Sandra Elliott ("Elliott"), the Hospital's Director of Quality Improvement and Resource Management. Elliott testified to five incidents of noncompliance with State regulations by Dr. Peyton which were reported to the State by the Hospital or the Hospital's Cancer Treatment Center. Elliott testified Dr. Peyton in one of these incidents was the chief treating physician but the patient received follow-up care from another physician. In the other four cases, Dr. Peyton was the chief treating physician. Elliott then testified to the various incidents which had been reported to the State. The first incident involved a patient of Dr. Peyton with kidney cancer. Dr. Peyton administered 30 radiation treatments over a six week period to the patient's left kidney. The cancer, however, involved the right kidney. The next two cases concerned patients who received brachytherapy treatment, which is the introduction of a radioactive source into the body to emanate radiation close to a tumor. In these two cases, in which Dr. Peyton was the chief treating physician, the radioactive source was not placed in the appropriate location, resulting in the two patients being overexposed to radiation. The fourth incident was the one where Dr. Peyton was the chief treating physician but really concerned another doctor who administered an electron "rev boost" to a breast cancer patient. The dosage apparently was too large and resulted in damage to the patient's lung. The fifth incident involved Dr. Peyton improperly securing radioactive materials which had been removed from a patient, which the Hospital claims resulted in the patient and several family members being exposed for approximately one hour to a radiation level high enough to require the incident to be reported to the State. This incident resulted in the State issuing a Notice of Noncompliance to the Hospital. Elliott testified the summary suspension of Dr. Peyton's privileges, in her opinion, was reasonable and necessary in order to reduce the substantial likelihood of immediate injury or damage to the health and safety of patients.

Mr. William Roughead ("Roughead") also testified. Roughead is a medical physicist at the Hospital and earned a Master's Degree in physics in 1983. Roughead testified to instances involving misadministration of radiation which he attributed to Dr. Peyton and involve some of the same incidents described by Elliott, although the specifics of the misadministration were testified to in much more detail by Roughead.

Ms. Diana Harrell ("Harrell"), a registered nurse who worked with Dr. Peyton, also testified to problems she encountered with Dr. Peyton. In particular, she testified Dr. Peyton had a "get them in, get them out" philosophy and explained the problems this caused, as well as problems with Dr. Peyton not properly reviewing patients' medical records. According to Harrell, in her professional judgment, there were "many frequent times when the attention that deserved to be afforded, either through the technical staff, the professional staff, or through the patient themselves, was dispelled" by Dr. Peyton. In her opinion, Dr. Peyton posed an immediate danger to the patients. Annette Lamberson, a radiation technologist, also testified to problems she encountered with Dr. Peyton's practices, including beginning treatment without all of the required information and his lack of communication with the staff.[4]

4. The Hospital also proffered testimony from other health care providers employed by the

Mr. Dennis Vonderfecht ("Vonderfecht"), the Hospital's Administrator and Chief Operating Officer testified the reasons Dr. Peyton was summarily suspended involved quality of care issues, his lack of leadership, and his poor relationships with Hospital employees. Vonderfecht denied Dr. Peyton's opening of clinics in the area in any way impacted on the decision to summarily suspend Dr. Peyton's staff privileges. He did, however, admit Dr. Peyton's opening of clinics was a concern of the Hospital.

Dr. Peyton admitted in his testimony he was at fault when he treated the wrong kidney of one of his patients. Dr. Peyton denied any improper medical treatment on his part with regard to the other four cases at issue. Several physicians were called on behalf of Dr. Peyton. These physicians reviewed medical records and other information prior to the hearing. They essentially testified there was no misadministration of radiation to two of the patients at issue or the impact of the dosage received, if it was incorrect, was minimal or nonexistent. The accuracy of the State's Notice of Noncompliance was challenged by one or more of these physicians, as was the testimony of several of the Hospital's witnesses. In rebuttal, the Hospital called a radiation oncologist as an expert witness. This physician testified the treatment of several of Dr. Peyton's patients fell below the acceptable standard of care. All in all, eighteen witnesses testified at the three day hearing.

On June 24, 1994, the Chairman of the Hearing Committee, Boyce Berry, M.D., sent a memorandum to Cameron Perry ("Perry"), President of the Hospital's Board of Directors. This memorandum stated:

Hospital. This testimony was essentially consistent with the testimony of Harrell and

After hearing testimony from eighteen (18) witnesses over a period of twenty three (23) hours, the hearing panel concurs with the Professional Review Board. The vote was passed by large majority, but not unanimously.

There was great concern expressed regarding Dr. Peyton's stability.

The decision of the panel was based not only on the medical management of the five cases presented but on the lack of management style and lack of compassion and team approach.

It was further decided by the panel that the evidence presented at this hearing did indicate that the summary suspension was necessary to reduce the substantial likelihood of immediate injury or damage to the health or safety of patients, employees or other persons present in the hospital....

On October 4, 1994, Perry issued a Written Decision of the Board which affirmed the recommendation of the Hearing Committee. The Written Decision states the basis for the decision was:

1. The Hearing Committee comprised of seven (7) members, four (4) of which were physicians, after receiving over twenty-three (23) hours of testimony and evidence, including that of Dr. Peyton and his seven (7) other witnesses, including several expert witnesses, concluded that the summary suspension of Dr. Peyton was reasonable. This committee had the exclusive opportunity to view witnesses in person; consider their credibility and demeanor; and also ask any questions the committee members felt relevant to the issues. Having this opportunity, it is clear that this committee's recommendation should

Lamberson.

be given great weight in any review of same.

2. The actions of Dr. Peyton, as set forth in his Notice of Summary Suspension, including his continual pattern of same and his unwillingness to modify his actions, conduct and method of practice, clearly presented and does still present a substantial likelihood of immediate injury and/or damage to the health and/or safety of patients, employees and/or other persons present in the Johnson City Medical Center Hospital.

Dr. Peyton appealed the decision of the Board of Directors to the Appellate Review Committee. On June 12, 1995, the Chairman of the Appellate Review Committee, James R. Kerrigan, M.D., issued a memorandum stating the Appellate Review Committee concurred in the decision of the Board of Directors. This decision was based on a review of the hearing transcript as well as written responses and oral statements by the parties. The decision of the Appellate Review Committee was unanimous. This memorandum went on to state:

> The committee agrees that Dr. Peyton's case has received fair and due legal process.... The committee believes the evidence demonstrates that Dr. Peyton's clinical practice methods confer a "substantial likelihood of immediate injury or damage to the health or safety of any patient, employee, or other person present in this hospital". Therefore, summary suspension was necessary and justifiable. Furthermore, the committee expresses concern about the failure of Dr. Peyton to demonstrate attention to details of patient care following the L.C. case.

On June 26, 1995, a Final Decision of the Board was rendered, concurring in the previous recommendations.

This lawsuit was filed by Dr. Peyton in September of 1995. Dr. Peyton is a licensed physician and is board certified in radiation oncology. From February 1, 1987, until April 24, 1994, Dr. Peyton maintained membership with the active medical staff and enjoyed full medical privileges at the Hospital. On or about April 29, 1994, the Hospital's Board of Directors or Executive Committee summarily suspended his medical staff membership and clinical staff privileges. Dr. Peyton claims, *inter alia*, that his suspension was not in accordance with the Hospital's bylaws. According to Dr. Peyton, the reasons given by the Hospital to support the revocation of his staff privileges (i.e. disregarding radiation safety procedure and policies, providing substandard quality of care, and engaging in disruptive behavior) were not supported by the evidence. Dr. Peyton sought compensatory and punitive damages totaling ten million dollars as well as injunctive relief.

The Hospital filed a motion for summary judgment with supporting affidavits. Perry's affidavit stated the decision of the Board of Directors was made: "(1) in the reasonable belief that the action was in furtherance of quality health care; (2) after a reasonable effort to obtain the facts of the matter; (3) after adequate notice and hearing procedures were afforded to Dr. Peyton; and (4) in the reasonable belief that the action was warranted by the facts known after all of the above." Perry also stated the action was taken after Dr. Peyton had been given every opportunity to correct his conduct and actions, and after Dr. Peyton was afforded due process and hearing procedures afforded to him under the Hospital's bylaws. Perry then detailed the hearing procedures and appeals afforded to Dr. Peyton. The Hospital also filed the affidavit of Vonderfecht, which was similar to Perry's affidavit.

In the memorandum filed in support of the motion for summary judgment, the Hospital detailed the problems it claimed it was having with Peyton. In this memorandum, the Hospital states:

The plaintiff was the main, and often only, radiation oncologist who practiced at the Hospital's Cancer Treatment Center (hereinafter "the CTC") for a period of approximately seven (7) years prior to his suspension. Throughout his tenure at the CTC, but particularly throughout the last year prior to his suspension, the Plaintiff had serious interpersonal problems with a number of team members associated with the CTC. Additionally, the Plaintiff exhibited a cavalier attitude toward his work and his patients which resulted in reporting to the State of Tennessee five (5) treatment errors during an approximately one (1) year period. Further, the Plaintiff continued a pattern of disregard for the rules and regulations of the Hospital, and reflected no intention to change any of his behavior with regard to any of the above.

The five incidents of treatment errors were described in the memorandum. As to the incident where Dr. Peyton treated the wrong kidney, the Hospital claimed when Dr. Peyton was presented with this information, his response was: "That's why I carry malpractice insurance." The memorandum then went on to explain several other problems encountered with Dr. Peyton's methods of practicing medicine.

With regard to Dr. Peyton's claimed inability to get along with Hospital employees, a Management Audit of the Cancer Treatment Center had been prepared in July of 1993 and was made a part of the record. Fifteen employees were interviewed during a one week period. The summary and employee recommendations contained within the Audit state as follows:

The vast majority of employees in the Cancer Treatment Center are currently at odds with Dr. Peyton. They describe the doctor as moody, explosive, unpredictable, pre-occupied, arrogant, and obsessively controlling. Whereas much of the conflict in 1989 centered upon physician-to-physician conflict, employees now report increased anxiety, paranoia, and chaos as a result of Dr. Peyton's efforts to retain control. Management within the department was rarely criticized and often praised during the interviews.... Most employees doubted Dr. Peyton's ability or willingness to change. These employees either strongly implied or directly stated that the physician should be replaced....

Dr. Peyton responded to the motion for summary judgment and also filed his own motion for summary judgment. In his response, Dr. Peyton essentially challenging the motivation of the Hospital in revoking his privileges. Dr. Peyton was in the process of opening cancer treatment centers in Boone, North Carolina, and Morristown, Tennessee. According to certain exhibits attached to Dr. Peyton's affidavit, the Hospital estimated the "annual adverse impact" upon the Hospital's net income to be over $900,000.00. The Hospital at one point declined an invitation by Dr. Peyton to be a part of this process and join a joint venture establishing these cancer treatment centers. Dr. Peyton also claimed the Hospital was motivated by his challenging certain Hospital policies and complaining about over-billing practices. Dr. Peyton argued four of the five alleged incidents of improper care set forth by the Hospital were so trivial they could not "reasonably" warrant permanent suspension of his privileges. Dr. Peyton further asserted the incident involving the patient whose wrong kidney was treated with radi-

ation was not sufficient to warrant permanent revocation of privileges.[5] Dr. Peyton made this same argument with respect to his alleged conduct with co-workers, etc. In his response to the Hospital's motion for summary judgment, Dr. Peyton concluded: "At most, a reasonable hospital would have limited only certain privileges, subject to a plan for Dr. Peyton to improve in those areas in order to achieve full reinstatement of those privileges. Therefore, any belief by the Hospital that its actions furthered quality of care were unreasonable." Dr. Peyton went on to add that "even if the evidence is viewed in the *least* favorable light to Dr. Peyton (which is not the standard for a review on summary judgment), at *most* a partial suspension would have been arguably reasonable, and a complete suspension totally insupportable."

The Trial Court granted the Hospital summary judgment with respect to any claim for monetary damages. In doing so, the Trial Court stated:

The Court finds that the peer review panel which conducted the Fair Review Hearing in this matter did meet the standards required by the Health Care Quality Improvement Act of 1986, as amended, to qualify for immunity from damages. This Court should not substitute its judgment for the peer review panel.

Therefore, this Court is of the opinion and hereby finds and orders that Defendant is immune from the monetary damages sought by Plaintiff and therefore Defendant's Renewed Motion for Partial Summary Judgment on the issue of monetary damages should be, and hereby is, granted. Accordingly, judgment is hereby entered in favor of Defendant

on the issue of monetary damages sought by Plaintiff.

## Discussion

■ As indicated previously, the Act includes a presumption that a professional review action has met the four prong test for immunity from monetary damages set forth in § 11112(a), unless a plaintiff can rebut this presumption by a preponderance of the evidence. The standard for reviewing a grant of summary judgment under the Act is, therefore, "unconventional: although the defendant is the moving party, we must examine the record to determine whether the plaintiff 'satisfied his burden of producing evidence that would allow a reasonable jury to conclude that the Hospital's peer review disciplinary process failed to meet the standards of HCQIA.'" *Brader v. Allegheny General Hospital*, 167 F.3d 832, 839 (3d Cir.1999)(quoting *Bryan v. James E. Holmes Reg'l Med. Ctr.*, 33 F.3d 1318, 1334 (11th Cir.1994)). We must, therefore, determine whether Dr. Peyton has met his burden under any of the four prongs set forth in Section 11112(a). At this point in the litigation, neither the Trial Court nor this Court need decide whether the action taken by the Hospital was correct. That issue remains to be decided by the Trial Court. *See Imperial v. Suburban Hosp. Ass'n, Inc.*, 37 F.3d 1026, 1030 (4th Cir. 1994)(Even if the plaintiff can show an incorrect decision was reached, "that does not meet the burden of contradicting the existence of a reasonable belief that they were furthering health care quality. . . .").

First, we must determine whether the Trial Court correctly held the professional review action was taken in the reasonable

---

5. This patient made a claim over the treatment he received to the wrong kidney. This claim was settled out of court with Dr. Pey-
ton's malpractice insurance carrier paying $300,000 and the Hospital paying $150,000.

belief that the action was in the furtherance of quality health care. Dr. Peyton contends he has raised material issues of fact as to whether the Hospital was motivated by something other than a reasonable belief that its actions would further the care of its patients. Many of the federal courts of appeal which have addressed similar arguments under the Act have adopted an objective standard of reasonableness in this context. *See Brader v. Allegheny General Hospital,* 167 F.3d 832, 840 (3d Cir.1999); *Imperial v. Suburban Hosp. Ass'n, Inc.,* 37 F.3d 1026, 1030 (4th Cir.1994); *Smith v. Ricks,* 31 F.3d 1478, 1485 (9th Cir.1994); *Bryan v. James E. Holmes Reg'l Med. Ctr.,* 33 F.3d 1318, 1335 (11th Cir.1994).

> Therefore, the good or bad faith of the reviewers is irrelevant. "The real issue is the sufficiency of the basis for the [Hospital's] actions." *Bryan,* 33 F.3d at 1335. The "reasonable belief" standard articulated in § 11112(a)(1) will be satisfied "if the reviewers, with the information available to them at the time of the professional review action, would reasonably have concluded that their actions would restrict incompetent behavior or would protect patients." *Mathews,* 87 F.3d at 635, quoting H.R.Rep. No. 903, 99th Cong., 2d Sess. 10 (1986) ....

*Brader v. Allegheny General Hospital,* 167 F.3d 832, 840 (3d Cir.1999). We agree with this position. Thus, Dr. Peyton's claim the Hospital acted in bad faith because he had or was in the process of opening medical clinics which would reduce the Hospital's gross revenue is not relevant. *See Mathews v. Lancaster General Hospital,* 87 F.3d 624, 634–35 (3d Cir.1996)(rejecting as immaterial the physician's argument the Hospital acted in bad faith because it was in direct economic competition with him). The real issue as to the first of the four prongs is the sufficiency of the basis for the Hospital's ac-

tion. *Bryan v. James E. Holmes Regional Medical Center,* 33 F.3d 1318, 1335 (11th Cir.1994), *cert denied,* 514 U.S. 1019, 115 S.Ct. 1363, 131 L.Ed.2d 220 (1995).

■ In the present case, the Hospital had significant concerns about Dr. Peyton's treatment of several patients. In fact, his treatment of one patient resulted in the Hospital's settling a claim for $150,000. While Dr. Peyton presented evidence that his treatment of four of the patients at issue was not improper, there also was abundant proof available to the Hospital to make it think otherwise. Furthermore, the Hospital was concerned about Dr. Peyton's ability to interact with the employees at the Hospital. Many employees of the hospital had been interviewed and their concerns about Dr. Peyton's personal and professional skills were made known. The Hospital undoubtedly was concerned about Dr. Peyton opening clinics which would reduce its revenue. This, however, does not negate the fact there were problems with Dr. Peyton's treatment of patients and his ability to work with Hospital employees. Dr. Peyton has not presented evidence that the professional review action taken by the Hospital was motivated by anything other than a reasonable belief that the action would further quality health care. *See Mathews v. Lancaster General Hospital,* 87 F.3d 624, 635 (3d Cir.1996) ("Dr. Mathews has presented evidence that defendants, including Lancaster General ... were his competitors. But he has not presented evidence that the professional review action taken by Lancaster General's Board was motivated by anything other than a reasonable belief that it would further quality health care. As the district court concluded after carefully reviewing the evidence, Dr. Mathews has failed to rebut § 11112(a)'s presumption that the peer reviewers' action met the standard

for immunity from suit for monetary damages. . . .").

The second prong of the test for immunity under § 11112(a) is whether the action was taken after a reasonable effort to obtain the facts of the matter. The relevant inquiry on this issue is whether "the totality of the process leading up to the Board's 'professional review action' . . . evidenced a reasonable effort to obtain the facts of the matter." *See Mathews v. Lancaster General Hospital,* 87 F.3d 624, 637 (3d Cir.1996). As noted previously, the Hospital reported five incidents to the State. Prior to the reports being made, at least some factual investigation took place. Many of the employees of the Hospital had been interviewed and had expressed concerns over Dr. Peyton's personal and professional skills. All of this culminated in a hearing which lasted approximately 23 hours where eighteen witnesses testified. Many of the witnesses were expert witnesses. The members of the Fair Hearing Panel, many of whom were physicians, were active during the hearing in asking questions they believed needed to be answered in order to make a determination. The opinion of the Fair Hearing Panel was appealed by Dr. Peyton to the Appellate Review Committee, which reviewed the transcript of the hearing as well as written responses and oral statements of the parties. The Appellate Review Committee unanimously concluded Dr. Peyton posed a "substantial likelihood of immediate injury or damage to the health or safety" of patients. Based on the events prior to, during, and after the hearing, we believe the only reasonable conclusion that can be reached is that the "totality of the process" leading up to the professional review action evidenced a *reasonable* effort to obtain the facts. The Act entitled Dr. Peyton to a reasonable investigation, "not a perfect investigation." *Egan v. Athol Me-morial Hospital,* 971 F.Supp. 37, 43 (D.Mass.1997).

The third prong under § 11112(a) is whether the professional review action was taken after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances. A health care entity will be deemed to have satisfied the third part of the § 11112(a) test if it follows the procedures set forth in § 11112(b), which provides:

Adequate notice and hearing. A health care entity is deemed to have met the adequate notice and hearing requirement of subsection (a)(3) with respect to a physician if the following conditions are met (or are waived voluntarily by the physician):

(1) Notice of proposed action. The physician has been given notice stating—

(A) (i) that a professional review action has been proposed to be taken against the physician,

(ii) *reasons for the proposed action,*

(B) (i) that the physician has the right to request a hearing on the proposed action,

(ii) any time limit (of not less than 30 days) within which to request such a hearing, and

(C) a summary of the rights in the hearing under paragraph (3).

(2) Notice of hearing. If a hearing is requested on a timely basis under paragraph (1)(B), the physician involved must be given notice stating—

(A) the place, time, and date, of the hearing, which date shall not be less than 30 days after the date of the notice, and

(B) a list of the witnesses (if any) expected to testify at the hearing on behalf of the professional review body.

(3) Conduct of hearing and notice. If a hearing is requested on a timely basis under paragraph (1)(b)—

(A) subject to subparagraph (B), the hearing shall be held (as determined by the health care entity)—

(i) before an arbitrator mutually acceptable to the physician and the health care entity,

(ii) before a hearing officer who is appointed by the entity and who is not in direct economic competition with the physician involved, or

(iii) before a panel of individuals who are appointed by the entity and are not in direct economic competition with the physician involved;

(B) the right to the hearing may be forfeited if the physician fails, without good cause, to appear;

(C) in the hearing the physician involved has the right—

(i) to representation by an attorney or other person of the physician's choice,

(ii) to have a record made of the proceedings, copies of which may be obtained by the physician upon payment of any reasonable charges associated with the preparation thereof,

(iii) to call, examine, and cross-examine witnesses,

(iv) to present evidence determined to be relevant by the hearing officer, regardless of its admissibility in a court of law, and

(v) to submit a written statement at the close of the hearing; and

(D) upon completion of the hearing, the physician involved has the right—

(i) to receive the written recommendation of the arbitrator, officer, or panel, including a statement of the basis for the recommendations, and

(ii) to receive a written decision of the health care entity, including a statement of the basis for the decision.

A professional review body's failure to meet the conditions described in this subsection shall not, in itself, constitute failure to meet the standards of subsection (a)(3).

42 U.S.C. § 11112(b).

Dr. Peyton was provided with notice of the proposed action and the reasons therefor on April 24, 1994. He was informed of his right to request a hearing within 30 days, which he did. Dr. Peyton was provided a summary of the rights he would have at the hearing. Dr. Peyton obtained counsel and the hearing was scheduled at a time when all parties and their attorneys could be present. Dr. Peyton acknowledges he was provided a list of potential witnesses to be called on behalf of the Hospital. At the hearing and thereafter, Dr. Peyton was provided all of the rights set forth in § 11112(b)(3)(C) and (D). In accordance with § 11112(b)(3)(A)(iii), the hearing was conducted before a panel of individuals who were appointed by the Hospital and who were not in direct economic competition with Dr. Peyton.

On appeal, Dr. Peyton challenges certain aspects of the hearing by pointing out what he considers to be a better method of handling certain aspects of the hearing. Whether or not the hearing could have been conducted in a better way is not relevant. The Hospital complied with the requirements of the statute and must, therefore, be "deemed" to have met the third prong of the test. Even if we were to find that all of the requirements of § 11112(b) were not met, we nevertheless believe Dr. Peyton was provided with adequate notice and hearing procedures as were fair "under the circumstances." *See Smith v. Ricks,* 31 F.3d 1478, 1487 (9th Cir.1994) (The Hospital's "procedures ei-

ther fit into the § 11112(b)(3) 'safe harbor,' or are so close to the 'safe harbor' that no reasonable jury could find Dr. Smith rebutted the presumption that the procedures were adequate.").

Dr. Peyton also takes issue with the fact that some members of the hearing panel were not physicians. Pursuant to § 11112(b)(3)(A), the hearing can be held before an arbitrator, a hearing officer, or a panel of individuals who are not in direct competition with the physician. We find no requirement in the statute that the "individuals" on a hearing panel be physicians. Had Congress intended that, they would have used the term "physicians" and not "individuals" in the statute. In *Meyers v. Logan Memorial Hospital*, 82 F.Supp.2d 707 (W.D.Ky.2000), the United States District Court for the Western District of Kentucky reached the same result, stating:

> Regarding the members of the Fair Hearing Committee, Dr. Meyers contends that the laymen comprising the Fair Hearing Committee do not qualify for immunity because the purpose of the HCQIA "is to encourage physicians to participate in peer review by granting them conditional immunity." He notes that although the Fair Hearing Committee was not comprised of physicians, its members seek the protection of the HCQIA's immunity. Nevertheless, the Court can find no provision of the HCQIA which requires the professional review process to be conducted by physicians only. In fact, the language of the HCQIA uses the word "person" rather than "physician" to describe those who will be granted immunity. 42 U.S.C. § 11111(a)(1)(B)-(D). Furthermore, under the HCQIA, a hearing may be conducted by an arbitrator, hearing officer, or panel of individuals, which contemplates the use of non-physicians in the professional review process. *Id.*

§§ 11112(b)(3)(A)(i)-(iii). Thus, the Court concludes that each of the Defendants asserting HCQIA immunity, including the members of the Fair Hearing Committee, is a person or entity entitled to summary judgment provided that all of the requirements of the HCQIA are satisfied.

*Meyers,* 82 F.Supp.2d at 713.

■ Dr. Peyton also challenges the procedures by arguing that portions of the Hospital's bylaws were not followed. Whether or not the Hospital followed the letter of its bylaws during this process is not germane to whether or not the Hospital is immune from damages under the Act. The test is whether the Hospital's procedures met the standards set forth in the Act. "[T]here is no statutory requirement set forth in the HCQIA that a peer review proceeding must be conducted in accordance with ... a hospital's own specific internal bylaws or procedures." *Meyers v. Logan Memorial Hospital,* 82 F.Supp.2d 707, 715 (W.D.Ky.2000)(quoting *Johnson v. Greater Southeast Community Hosp. Corp.,* No. Civ.A. 90–1992 RCL, 1996 WL 377147, at *4, 1996 U.S. Dist. LEXIS 9532 at *14 (D.D.C. June 24, 1996), *aff'd without published opinion,* 132 F.3d 1481 (D.C.Cir.1997)).

The fourth prong of the test is whether the professional review action was taken in the reasonable belief that the action was warranted by the facts known after such reasonable effort and after meeting the requirements for notice and the hearing. Several witnesses testified to Dr. Peyton's inability to get along with many of the Hospital's staff members, which is certainly a legitimate concern of the Hospital. "Quality patient care demands that doctors possess at least a reasonable 'ability to work with others.'" *Meyers v. Logan Memorial Hospital,* 82 F.Supp.2d 707, 714

(W.D.Ky.2000)(quoting *Rooney v. Medical Ctr. Hosp.*, No. C2–91–1100, 1994 WL 854372, at *3, 1994 U.S. Dist. LEXIS 7420 (S.D.Ohio March 30, 1994) and *Everhart v. Jefferson Parish Hosp.*, 757 F.2d 1567, 1573 (5th Cir.1985)). There also were several witnesses who testified to improper medical care rendered by Dr. Peyton. Without restating all of the evidence, Dr. Peyton simply failed to rebut the presumption accorded to the Hospital under the Act that its action was based on a reasonable belief that the action was warranted by the facts and after it conducted a reasonable investigation.

Dr. Peyton argues there were two distinct peer review actions which took place and the Hospital is, therefore, required to comply with the standards of § 11112 for each particular action. More specifically, Dr. Peyton asserts the summary suspension was a peer review action, and the subsequent permanent suspension was a separate and distinct peer review action. We need not decide whether these were two separate peer review actions or whether one is simply a continuation of the other. The issue can be resolved by looking to the plain language of § 11112(c)(2), which states that for purposes of § 11111(a), "nothing in this section shall be construed as . . . precluding an immediate suspension or restriction of clinical privileges, subject to subsequent notice and hearing or other adequate procedures, where the failure to take such an action may result in an imminent danger to the health of an individual." This is exactly what happened in the present case. Dr. Peyton's hospital privileges were summarily suspended, and he was thereafter provided with the necessary protections set forth in the statute. In light of our conclusion above that the revocation of Dr. Peyton's privileges was undertaken in a reasonable belief "that the action was in the furtherance of quality health care", we must likewise conclude the summary suspension which occurred on April 24, 1994, was taken because the failure to do so may have resulted in an imminent danger to the health of an individual. 42 U.S.C. § 11112(c)(2).

Finally, we will discuss briefly Dr. Peyton's argument made in his response to the Hospital's motion for summary judgment that "[a]t most, a reasonable hospital would have limited only certain privileges, subject to a plan for Dr. Peyton to improve in those areas in order to achieve full reinstatement of those privileges." It appears Dr. Peyton acknowledges at least some action may have been reasonable. If some action would have been reasonable and in the furtherance of quality health care, then certainly the action the Hospital took would likewise be in furtherance of quality health care. Simply because Dr. Peyton disagrees with the degree of action taken by the Hospital in no way means the Hospital's motivation was improper.

We affirm the judgment of the Trial Court granting the Hospital partial summary judgment pursuant to the federal Health Care Quality Improvement Act of 1986, 42 U.S.C. § 11101, *et seq.* We again point out that in affirming the grant of partial summary judgment, we express no opinion on any remaining claims asserted by Dr. Peyton.

### Conclusion

The judgment of the Trial Court granting partial summary judgment is affirmed, and this cause is remanded to the Trial Court for such further proceedings as may be required, consistent with this Opinion, and for collection of the costs below. The costs on appeal are assessed against the Appellant, Dr. Richard R. Peyton, and his surety.