IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 8, 2007 Session

## JOSEPH C. CURTSINGER, JR., M.D. v. HCA, INC., ET AL.

Appeal from the Chancery Court for Davidson County
No. 04-3026-III     Ellen Hobbs Lyle, Chancellor

No. M2006-00590-COA-R3-CV - Filed on April 27, 2007

Surgeon filed action against hospital and other related persons and entities seeking injunctive relief and monetary damages for the allegedly improper revocation of his hospital privileges and the false reporting of such to the State Medical Board and the National Practitioner Data Bank. The trial court granted Defendants partial summary judgment on all monetary claims asserted by surgeon pursuant to the Health Care Quality Improvement Act (HCQIA) and the Tennessee Peer Review Law. Having found that surgeon failed to show by a preponderance of the evidence that Defendants did not satisfy the four prong test for immunity provided under HCQIA, we affirm the decision of the trial court in all respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which PATRICIA J. COTTRELL and FRANK G. CLEMENT, JR., JJ., joined.

Matthew B. Zenner, Nashville, Tennessee, for the appellant, Joseph C. Curtsinger, Jr., M.D.

C.J. Gideon, Timothy McIntire, Nashville, Tennessee, for the appellees, HCA Health Services of Tennessee, Inc. d/b/a Southern Hills Medical Center, Victor E. Giovanetti, Joseph A. Wieck, M.D., and Malcolm E. Baxter, M.D.

## OPINION

Appellant, Dr. Joseph Curtsinger, is a surgeon and former member of the Southern Hills Medical Center (SHMC) staff. On July 2, 2003, Dr. Curtsinger received a notice of suspension from SHMC for allegedly refusing to respond to three emergency room calls on June 30, 2003, and for allegedly engaging in a pattern of unprofessional and disruptive behavior towards patients and other SHMC employees. An investigation was conducted as a result of the suspension and the Medical Executive Committee (MEC) determined on July 10, 2003, that Dr. Curtsinger would remain suspended until various conditions were satisfied. In a letter dated July 22, 2003, Dr. Curtsinger agreed to the conditions, requested termination of his suspension and asked that he be placed on

voluntary leave of absence pending the satisfaction of the conditions. On July 24, 2003, the MEC terminated Dr. Curtsinger's suspension and granted his request for leave of absence.

Believing that he had satisfied the conditions for reinstatement, Dr. Curtsinger requested on August 22, 2003, that his leave of absence be terminated and that he be reinstated to the SHMC medical staff. Upon consideration of the recommendations of the MEC, the SHMC Board of Trustees conditionally approved Dr. Curtsinger's request for reinstatement so long as he executed an agreement with SHMC. However Dr. Curtsinger refused to execute the agreement, claiming that it divested him of rights guaranteed to him under SHMC Bylaws. As a result of Dr. Curtsinger's refusal to sign the agreement, the MEC recommended that the Board of Trustees deny Dr. Curtsinger's request for reinstatement.

On January 26, 2004, Dr. Curtsinger was afforded a fair hearing appeal to present evidence in favor of his reinstatement and to refute the allegations of the MEC. On February 12, 2004, the MEC recommended denial of Dr. Curtsinger's reinstatement, which became final since Dr. Curtsinger did not request appellate review. Because the professional review action adversely affected Dr. Curtsinger's clinical privileges for a period longer than thirty (30) days, SHMC reported the adverse professional peer review action to the State Medical Board and the National Practitioner Data Bank on April 13, 2004.

On October 22, 2004, Dr. Curtsinger filed an action against Defendants alleging various claims arising from his permanent suspension including (1) breach of contract; (2) interference with his prospective economic advantages; (3) interference with his right to practice his profession and civil conspiracy; (4) violations of the Sherman Anti-Trust Act and conspiracy to restrain trade; (5) wrongly and inaccurately reporting his adverse peer review action to the National Practitioner Data Bank; and (6) bad faith and libel. On January 7, 2005, Defendants filed a motion for partial summary judgment alleging that they were immune from any monetary damages asserted by Dr. Curtsinger pursuant to the Health Care Quality Improvement Act (HCQIA) and the Tennessee Peer Review Law.

Dr. Curtsinger sought additional time for discovery in order to gain more information prior to responding to Defendants' motion for partial summary judgment. On March 16, 2005, the trial court denied Dr. Curtsinger's discovery request, on the grounds that the requested information was privileged and barred from discovery under the Tennessee Peer Review Law and the Tennessee Supreme Court's decision in *Eyring v. Fort Sanders Parkwest Med. Ctr., Inc.*, 991 S.W.2d 230 (Tenn.1999). The court entered a briefing schedule allowing Dr. Curtsinger until April 8, 2005, to respond to Defendants' motion, and Defendants until April 15, 2005, to reply. On April 15, 2005, Defendants sought leave of court to file under seal the additional affidavits of Drs. Wieck and Giovanetti, which the court granted on April 28, 2005.

On June 8, 2005, the trial court granted Defendants' motion for partial summary judgment, finding that Defendants were immune from monetary damages for the peer review action taken against Dr. Curtsinger pursuant to HCQIA and the Tennessee Peer Review Law. On February 21,

2006, the court entered an agreed order voluntarily dismissing all of Dr. Curtsinger's remaining claims without prejudice. Dr. Curtsinger appeals arguing that the trial court erred in (1) denying him the opportunity to engage in discovery prior to responding to Defendants' motion for partial summary judgment; (2) allowing Defendants to submit additional affidavits in support of their motion; (3) granting Defendants partial summary judgment pursuant to HCQIA and the Tennessee Peer Review Law; and (4) finding that the information supplied by Defendants to the National Practitioner Data Bank was sufficiently accurate and not made in bad faith or with malice.

## I. DISCOVERY

As an initial matter, Dr. Curtsinger argues that the trial court erred in denying him the opportunity to engage in discovery prior to responding to Defendants' motion for partial summary judgment. However pursuant to the Tennessee Peer Review Law, a plaintiff in a professional peer review court action does not have an unfettered right to discovery as it relates to the deliberative process in a professional peer review investigation. Tennessee Code Annotated section 63-6-219(e) provides that:

> (e) All information, interviews, incident or other reports, statements, memoranda or other data furnished to any committee as defined in this section, and any findings, conclusions or recommendations resulting from the proceedings of such committee are declared to be privileged. All such information, in any form whatsoever, so furnished to, or generated by, a medical peer review committee, shall be privileged. The records and proceedings of any such committees are confidential and shall be used by such committee, and the members thereof only in the exercise of the proper functions of the committee, and shall not be public records nor be available for court subpoena or for discovery proceedings. One (1) proper function of such committees shall include advocacy for physicians before other medical peer review committees, peer review organizations, health care entities, private and governmental insurance carriers, national or local accreditation bodies, and the state board of medical examiners of this or any other state. The disclosure of confidential, privileged peer review committee information to such entities during advocacy, or as a report to the board of medical examiners under § 63-6-214(d), or to the affected physician under review, does not constitute either a waiver of confidentiality or privilege. Nothing contained in this subsection (e) applies to records made in the regular course of business by a hospital or other provider of health care and information, documents or records otherwise available from original sources are not to be construed as immune from discovery or use in any civil proceedings merely because they were presented during proceedings of such committee.

In *Eyring*, 991 S.W.2d at 239, the Tennessee Supreme Court addressed the application of Tennessee Code Annotated section 63-6-219(e) in a discovery proceeding. Said the Court:

This statute creates a broad privilege from disclosure for "[a]ll information, interviews, incident or other reports, statements, memoranda or other data ... and any findings conclusions or recommendations resulting from the [committees'] proceedings." *Id.* In our view, this broad language encompasses any and all matters related to the peer review process itself. We reject Eyring's contention that the statute grants an implicit right to any information "furnished to or resulting from the proceedings" of the peer review committees.

It appears, however, that the broad language extending the privilege from discovery must be reconciled with the statutory requirement that the plaintiff bear the burden of producing evidence of malice and bad faith. We therefore agree with the trial court's ruling allowing Eyring to conduct discovery for the limited purpose of investigating the committee members' good faith, malice, and reasonable knowledge or belief, but prohibiting any inquiry into the peer review process itself. *Cf. Alexander v. Memphis Individual Prac. Ass'n,* 870 S.W.2d 278 (Tenn.1993). Accordingly, we conclude that the trial court was correct and that the broad language of the statute encompasses any and all matters related to the peer review process.

*Eyring*, 991 S.W.2d at 239.

We therefore must determine whether Dr. Curtsinger's discovery request was limited to investigating the MEC's good faith, malice, and reasonable knowledge or belief or whether the request delved into the peer review process itself. The discovery which Dr. Curtsinger sought to obtain specifically included:

1. What factor the defendants advance that would lead a reasonable person to the conclusion that a patient incident of an undefined nature that preceded Dr. Curtsinger's reappointment to the SHMC staff in early 2003 supports a conclusion that there existed a "substantial likelihood of imminent injury";
2. What factor the defendants advance as leading a reasonable person to the conclusion how an unidentified June 2003 encounter with an employee supports a conclusion that there exists a "substantial likelihood of imminent injury";
3. Three alleged refusals on June 30 to respond to general surgery on call assignment in the emergency department since the proof will show that the on call schedule given to Dr. Curtsinger showed that he was not on call that night and that Dr. Curtsinger offered to come in if the doctor who was on call could not be reached;
4. Why comments made to others expressing concern about Dr. Angie Larson somehow justified the conclusion that there was a substantial likelihood of imminent injury;
5. An explanation of why the summary suspension of non-existent privileges was in furtherance of quality health care by preventing a substantial likelihood of imminent injury;

6. How the denial of [a] nonexistent request to return to staff was in furtherance of quality [] healthcare by prevent[ing] a substantial likelihood of imminent injury;

7. How the hearing resulted in a determination by the defendants that the plaintiff should not be reinstated to the staff when the fair hearing committee found in the plaintiff's favor; and

8. The facts defendants rely upon in establishing a reasonable investigation into the various accusations and how they justified a conclusion that the actions taken were in furtherance of quality healthcare to prevent a substantial likelihood of imminent injury.

Dr. Curtsinger's discovery request primarily concerned the reasoning behind the professional peer review committee's decision to deny Dr. Curtsinger reinstatement. Clearly, this inquiry into the deliberative process is prohibited by the Tennessee Peer Review Law. Likewise, the remaining discovery requests concerned facts obtained by the professional peer review committee surrounding four incidents upon which Dr. Curtsinger's summary suspension was based, the efforts to obtain such facts, and other facts concerning later incidents of allegedly disruptive behavior. Based on the broad language of Tennessee Code Annotated section 63-6-219(e), we agree with the trial court that this information is not discoverable because it constitutes "information ... or other data furnished to any committee as defined in this section, and any findings, conclusions or recommendations resulting from the proceedings of such committee." Accordingly, we find no merit in Dr. Curtsinger's first assignment of error.

## II. SUBMISSION OF ADDITIONAL AFFIDAVITS

Dr. Curtsinger next contends that the trial court erred in allowing Defendants to submit additional affidavits prior to ruling on Defendants' motion for partial summary judgment. On April 28, 2005, the trial court granted Defendants an extension of time in which to file under seal the affidavits of two MEC members, providing the court with confidential information that Defendants were given in making their peer review determination, although the court found that Dr. Curtsinger had "demonstrated sufficient facts to meet the burden of proof filed by the defendants." The court reasoned that "the purpose of summary judgment is to lower costs and increase efficiency by narrowing the issues for trial. In the interests of efficiency of time and money, the Court is persuaded to allow the defendants to file the additional papers to provide the Court complete facts to maximize the efficiencies of the motion for partial summary judgment and because HCQIA immunity is a question of law for the Court to decide." Dr. Curtsinger contends that in allowing Defendants to file additional affidavits, the trial court violated Tennessee Rule of Civil Procedure 56.04 which states that "[t]he adverse party may serve and file opposing affidavits not later than five (5) days before the hearing." We disagree.

Tennessee Rule of Civil Procedure 56.06 provides that "[t]he court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits." And relief from the deadlines imposed by the Tennessee Rules of Civil Procedure rests soundly within the discretion of the trial court. *Kenyon v. Handal*, 122 S.W.3d 743, 753 (Tenn.Ct.App.2003).

Moreover, Dr. Curtsinger was by no means prejudiced by the court's decision to allow Defendants to submit additional affidavits since the court also provided Dr. Curtsinger with additional time in which to file supplemental affidavits and reply briefs. Thus, we find no error in the trial court's decision to allow Defendants to submit additional affidavits prior to ruling on Defendants' motion for partial summary judgment.

### III. PARTIAL SUMMARY JUDGMENT UNDER HCQIA AND THE TENNESSEE PEER REVIEW LAW

Dr. Curtsinger's primary contention on appeal concerns the trial court's decision to grant Defendants' motion for partial summary judgment thereby dismissing all of Dr. Curtsinger's monetary claims. Under HCQIA and the Tennessee Peer Review Law[1], the individuals and institutions participating in or assisting with a professional medical review process are generally granted immunity from monetary damages for their actions. 42 U.S.C. § 11111; Tenn.Code Ann § 63-6-219(d)(1); *Peyton v. Johnson City Med. Ctr.*, 101 S.W.3d 76, 78 (Tenn.Ct.App.2002). The purpose of granting such individuals and entities immunity is "to encourage committees made up of Tennessee's licensed physicians to candidly, conscientiously, and objectively evaluate and review their peers' professional conduct, competence, and ability to practice medicine." Tenn.Code Ann. § 63-6-219(b)(1). However, in order for immunity to apply, the professional review action must be taken:

> (1) in the reasonable belief that the action was in the furtherance of quality health care;
> (2) after a reasonable effort to obtain the facts of the matter;
> (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances; and
> (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirements of paragraph (3)...

42 U.S.C. §11112(a).

HCQIA and the Tennessee Peer Review Law also provide a presumption that the professional review action properly met the four prong test for immunity, unless the plaintiff can rebut the presumption by a preponderance of the evidence. 42 U.S.C. § 11112(a); Tenn.Code Ann. § 63-6-219(d)(3); *Peyton*, 101 S.W.3d at 83. Accordingly, the standard for reviewing a grant of summary judgment under HCQIA and the Tennessee Peer Review Law is "unconventional: although the defendant is the moving party, we must examine the record to determine whether the plaintiff 'satisfied his burden of producing evidence that would allow a reasonable jury to conclude that the

---

[1]The Court would note that the provisions of HCQIA are "essentially identical to those of the Tennessee Peer Review Law." *Ironside v. Simi Valley Hosp.*, 188 F.3d 350, 353-54 (6th Cir.1999).

Hospital's peer review disciplinary process failed to meet the standards of HCQIA.'" *Brader v. Allegheny Gen. Hosp.*, 167 F.3d 832, 839 (3rd Cir.1999) (quoting *Bryan v. James E. Holmes Reg'l Med. Ctr.*, 33 F.3d 1318, 1334 (11th Cir.1994)). Therefore, it is not our duty at this time to determine whether the disciplinary action taken by Defendants against Dr. Curtsinger was correct, but rather, whether Dr. Curtsinger has shown by a preponderance of the evidence that Defendants failed to satisfy the four prong test provided in 42 U.S.C. § 11112(a).

In doing so, we must first address whether the trial court properly found that the professional review action was taken "in the reasonable belief that the action was in the furtherance of quality health care." 42 U.S.C. § 11112(a)(1). We use an objective standard of reasonableness in determining the sufficiency of the basis of Defendants' action. *Peyton*, 101 S.W.3d at 84. The reasonable belief standard provided in 42 U.S.C. § 11112(a)(1) is satisfied "if the reviewers, with the information available to them at the time of the professional review action, would reasonably have concluded that their actions would restrict incompetent behavior or would protect patients." *Peyton*, 101 S.W.3d at 84 (quoting H.R.Rep. No. 903, 99th Cong., 2d Sess. 10 (1986)).

Based on the affidavits of Drs. Giovanetti and Wieck, we agree with the trial court that Defendants reasonably believed that Dr. Curtsinger's disruptive behavior and his failure to respond to three emergency room calls on June 30, 2003, would hinder quality health care. Dr. Wieck discussed the incidents which raised concern over Dr. Curtsinger's personal and professional ability to interact with patients and other SHMC employees in his affidavit, where he stated:

> ...Specifically, there were reports that, in October 2002, Dr. Curtsinger disrupted the ER by "ranting and raving" for at least one hour regarding the process by which a patient came into the ER. Dr. Curtsinger's disruptive behavior and inappropriate commentary affected the ER nursing staff and at least a few physicians. And during the hospitalization of this same patient, she rendered a complaint about Dr. Curtsinger...
>
> 7. A second collegial intervention with Dr. Curtsinger was held by the Surgical Advisory Committee in February 2003. The collegial intervention was held because of reports that Dr. Curtsinger refused to issue a STAT order for a small bowel follow-through exam that he ordered to rule out a possible bowel obstruction and to speak directly with the on-call radiologist to discuss the need for the procedure. The conflict persisted for approximately six hours and left the patient and her family upset and the nursing staff frustrated.
>
> ...
>
>> a. A patient complaint about statements made by Dr. Curtsinger on November 19, 2002, during the course of Dr. Curtsinger's final examination of the patient. Reportedly with three visitors present, Dr. Curtsinger made the following statements to the patient: (1) "You need to take your ass to Meharry to have it looked at where it is free;" and (2) "You need to get your act straight because being a cook isn't cutting it, and you need to get a real job with benefits."

b. Dr. Angie Larsen advised the Chief of Staff on June 30, 2003 that Dr. Curtsinger had made demeaning and potentially, professionally damaging comments about her. Specifically, he had discussed with other members of the Medical Staff and nurses his stated opinion that Dr. Larsen was emotionally and mentally unstable and the possibility that she might be suffering a "nervous breakdown."

c. The CEO was advised that Dr. Curtsinger had commented to a nurse that she should "get out [of Southern Hills]" while she could and that [Southern Hills] is going down."

...

13. Just after the July 2003 summary suspension was lifted, a patient who was scheduled to have a procedure at Southern Hills complained that Dr. Curtsinger had lied to her about two matters. First, Dr. Curtsinger lied to her about why the previously scheduled procedure had to be re-scheduled. Second, Dr. Curtsinger either stated to the patient or gave the patient the impression that a particular physician was his partner.

Dr. Curtsinger however argues that his allegedly disruptive behavior could not have hindered quality healthcare because his behavior had no effect on his qualifications and competence as a surgeon. A similar argument was made and dismissed by the court in *Gordon v. Lewistown Hosp.*, 423 F.3d 184 (3rd Cir.2005). Said the court:

It is Gordon's position that the professional conduct at issue did not affect adversely the health or welfare of patients as required by § 11151(9), and therefore there was no professional review action to confer immunity on the Hospital. He asserts that he only could be expelled from the medical staff as a result of a professional review action if it was based on either his competence or his professional conduct, which conduct affects or could affect adversely the health or welfare of a patient or patients. *See* 42 U.S.C. § 11151(9). Since his professional competence has never been in dispute, Gordon argues that he was expelled for his conduct in violating the Conditions-his telephone conversation with Mrs. Seecora and the June 4th letter. According to Gordon, in order to qualify its actions based on that conduct as a "professional review action" entitled to immunity under the HCQIA, the Hospital bore the burden to show that his conduct "could affect adversely the health or welfare of patients".

...

Such unprofessional conduct on the part of a physician is within the purview of a "professional review action" under the HCQIA. The plain language of the statute indicates the breadth of "conduct" encompassed within the definition of "professional review action" by the inclusion of conduct that "could affect adversely the health or welfare of a patient." 42 U.S.C. § 11151(9). The statute contemplates not only potential harm through use of the term "could," but it also affords protection to actions taken against physician conduct that either impacts or potentially impacts

patient "welfare" adversely, meaning patient "well being in any respect; prosperity." Black's Law Dictionary (West Group, 7th Ed.1999). Even if the statutory language was deemed to be ambiguous, the legislative history would support the same construction. *See* Health Care Quality Improvement Act of 1986, H.R. 5540, 99th Cong.2d Session (1986), 132 Cong. Rec. at 30768 (Oct. 14, 1986) ("competence and professional conduct should be interpreted in a way that is sufficiently broad to protect legitimate actions based on matters that raise concerns for patients or patient care."). Other courts similarly have applied immunity in circumstances where a physician's unprofessional "conduct" was an issue in the challenged professional review actions. *See, e.g., Brader v. Allegheny Gen. Hosp.,* 167 F.3d 832, 835 (3d Cir.1999) (affirming summary judgment in favor of Hospital afforded HCQIA immunity for peer review decisions involving a surgeon characterized as "a disruptive force in the hospital"); *Bryan v. James E. Holmes Reg'l Med. Ctr.,* 33 F.3d 1318, 1324 (11th Cir.1994) (granting immunity when physician's privileges revoked for inappropriate and unprofessional behavior stemming from his "being a volcanic-tempered perfectionist, a difficult man with whom to work, and a person who regularly viewed it as his obligation to criticize staff members at [the Hospital] for perceived incompetence or inefficiency," some of which occurred in front of patients about to undergo surgery); *Morgan v. PeaceHealth, Inc.,* 101 Wash.App. 750, 14 P.3d 773 (2000) (upholding immunity when physician's privileges suspended for sexual harassment and inappropriate behavior with patients); *Meyers v. Columbia/HCA Healthcare Corp.,* 341 F.3d 461 (6th Cir.2003) (upholding immunity when physician's reappointment denied because of failure to timely disclose disciplinary actions in another state, personality problem and various incidents of disruptive behavior); *Imperial v. Suburban Hosp. Ass'n,* 37 F.3d 1026 (4th Cir.1994) (affirming district court order granting summary judgment to hospital where physician's reappointment to staff denied on basis of hospital's conclusion that his professional activities did not meet standard of care, he was deficient in his record keeping, patient management, and work relationships with health care professionals at the hospital).

*Gordon*, 423 F.3d at 202-204.

Because "'[q]uality healthcare' is not limited to clinical competence, but includes matters of general behavior and ethical conduct," *Meyers v. Columbia/HCA Healthcare Corp.*, 341 F.3d 461, 469 (6th Cir.2003), we find no merit in Dr. Curtsinger's argument that the peer review committee could not have reasonably believed that his disruptive behavior and unprofessional conduct towards patients and fellow employees would jeopardize the quality of healthcare at SHMC.

Defendants also based Dr. Curtsinger's suspension on evidence that Dr. Curtsinger refused to respond to three calls from the SHMC emergency room on June 30, 2003. Dr. Wieck explained the June 30, 2003, incident in his affidavit:

8. From approximately 12:43 a.m. through 4:28 a.m. on June 30, 2003, Dr. Curtsinger refused to accept three calls from the ER for surgical consultations. All three patients were very ill with serious conditions requiring the services of a surgeon; additionally, each case was an emergency. The first call concerned a patient with a collapsed lung. The second call concerned a patient who had been stabbed in the buttocks area with a Ginsu knife; the ER physician needed a surgeon because he could not stop the bleeding. The third and final call concerned a 49 year old female with an acute abdomen. Later on June 30th, emergenc[y] surgery was required for this patient because it was determined she had a perforated colon.

9. Dr. Curtsinger was the surgeon on call from 0700 on June 29, 2003 through 0700 on June 30, 2003, according to the ER's revised call schedule. The reports from the hospital personnel who contacted Dr. Curtsinger when surgical consultations were needed did not indicate that Dr. Curtsinger offered to respond to the call if another physician did not. To the contrary, it was reported that Dr. Curtsinger's response to each call from the ER was that he was not on call and Dr. Angie Larson was on call. Fortunately, Dr. Larsen agreed to accept the three calls. The only report or indication that Dr. Curtsinger did not refuse to come in to the hospital to see these patients came from Dr. Curtsinger at a later time.

While Dr. Curtsinger contends that his failure to respond to the emergency room calls was merely a result of changes being made to the previously posted schedule without his notice, Dr. Giovanetti explained in his affidavit that the mistake created an unacceptable and potentially dangerous interruption to the call schedule.

5. When Dr. Curtsinger did not promptly and appropriately respond to the three calls from the Emergency Room between 12:43 a.m. and 4:28 a.m. on June 30, 2003, Dr. Curtsinger interrupted the call schedule. Aside from Dr. Curtsinger's later explanation, there was no indication from the reports of Dr. Curtsigner's behavior that he offered to respond to the calls if Dr. Angie Larsen refused to see the patients. Dr. Curtsinger's reported refusal to immediately respond to the calls by coming into see the patients and the delays that resulted from the efforts to locate a surgeon willing to evaluate the patients could have harmed them. Overnight calls to surgeons from the emergency room for surgical consultations are usually necessitated by urgent patient care needs. The calls on June 30, 2003 were no different. Not only did Dr. Curtsinger's conduct disrupt the flow of patient care in the ER, but it also posed an imminent threat of harm to patients. Moreover, if this behavior by Dr. Curtsinger was repeated, patients would again be placed in harm's way. The Rules and Regulations for Southern Hills' Medical Staff provide that call coverage must be uninterrupted twenty-four hours per day, seven days per week. Thus, reports of Dr. Curtsinger's responses to the three calls on June 30, 2003, also constituted a willful disregard for the Medical Staff Bylaws, Rules, and Regulations.

Dr. Curtsinger's arguments fail to present any evidence that the professional review action taken by SHMC was motivated by anything other than a reasonable belief that the action would further quality health care.

Under the second prong of the immunity test provided under HCQIA, we must determine whether the action was taken "after a reasonable effort to obtain the facts of the matter." 42 U.S.C § 11112(a)(2). In making such a determination, we must decide whether "the totality of the process leading up to the Board's 'professional review action' ... evidenced a reasonable effort to obtain the facts of the matter." *Mathews v. Lancaster Gen. Hosp.*, 87 F.3d 624, 637 (3rd Cir.1996).

Despite Dr. Curtsinger's arguments to the contrary, there was an extensive review process conducted in this matter. First, an investigation was conducted into Dr. Curtsinger's alleged pattern of disruptive behavior as well as the events occurring on June 30, 2003. The MEC thereafter held a special meeting during which time the MEC determined that Dr. Curtsinger's behavior warranted suspension. The MEC advised Dr. Curtsinger of his right under SMHC Bylaws to a fair hearing in order to oppose the sanctions imposed by the MEC. After Dr. Curtsinger applied for reinstatement, Dr. Curtsinger's case was further investigated and discussed by the Medical Staff Credentials Committee, the MEC, and the Board of Trustees. On January 27, 2004, Dr. Curtsinger was afforded a fair hearing before the peer review committee where he and his attorney were able to present evidence in support of his reinstatement and to refute the allegations asserted by the MEC. The peer review committee later presented their report to the MEC and the Board of Trustees, which ultimately resulted in Dr. Curtsinger's permanent suspension. Dr. Curtsinger's arguments that he was not afforded a peer review hearing before the MEC first issued sanctions against him, that he allegedly complied with all the requirements set forth by the MEC for reinstatement, and that he engaged in no disruptive behavior after the initial sanctions issued by the MEC, fail to raise a genuine issue to rebut the presumption that the professional review action was taken after a "reasonable effort to obtain the facts."

The third element of the HCQIA immunity test is whether "adequate notice and hearing procedures [were] afforded to the physician involved." 42 U.S.C. § 11112(a)(3). A health care entity is deemed to have satisfied the third prong of 42 U.S.C. § 11112(a)(3) if the requirements set forth in 42 U.S.C. § 11112(b) are met:

> A health care entity is deemed to have met the adequate notice and hearing requirement of subsection (a)(3) of this section with respect to a physician if the following conditions are met (or are waived voluntarily by the physician):
> (1) Notice of proposed action
> The physician has been given notice stating--
> (A)(I) that a professional review action has been proposed to be taken against the physician,
> (ii) reasons for the proposed action,
> (B)(I) that the physician has the right to request a hearing on the proposed action,

(ii) any time limit (of not less than 30 days) within which to request such a hearing, and

(C) a summary of the rights in the hearing under paragraph (3).

(2) Notice of hearing

If a hearing is requested on a timely basis under paragraph (1)(B), the physician involved must be given notice stating--

(A) the place, time, and date, of the hearing, which date shall not be less than 30 days after the date of the notice, and

(B) a list of the witnesses (if any) expected to testify at the hearing on behalf of the professional review body.

(3) Conduct of hearing and notice

If a hearing is requested on a timely basis under paragraph (1)(B)--

(A) subject to subparagraph (B), the hearing shall be held (as determined by the health care entity)--

(I) before an arbitrator mutually acceptable to the physician and the health care entity,

(ii) before a hearing officer who is appointed by the entity and who is not in direct economic competition with the physician involved, or

(iii) before a panel of individuals who are appointed by the entity and are not in direct economic competition with the physician involved;

(B) the right to the hearing may be forfeited if the physician fails, without good cause, to appear;

(C) in the hearing the physician involved has the right--

(I) to representation by an attorney or other person of the physician's choice,

(ii) to have a record made of the proceedings, copies of which may be obtained by the physician upon payment of any reasonable charges associated with the preparation thereof,

(iii) to call, examine, and cross-examine witnesses,

(iv) to present evidence determined to be relevant by the hearing officer, regardless of its admissibility in a court of law, and

(v) to submit a written statement at the close of the hearing; and

(D) upon completion of the hearing, the physician involved has the right--

(I) to receive the written recommendation of the arbitrator, officer, or panel, including a statement of the basis for the recommendations, and

(ii) to receive a written decision of the health care entity, including a statement of the basis for the decision.

U.S.C. § 11112(b).

In this case, Defendants clearly complied with the conditions contained in 42 U.S.C. § 11112(b). Dr. Curtsinger was provided notice of his first summary suspension and the reasons therefor on July 2, 2003, as well as notice of his second summary suspension and the reasons therefor on December 4, 2003. Due to the adverse recommendation of the MEC, Dr. Curtsinger was informed of his right to request a hearing within fourteen days, which he exercised. Dr. Curtsinger

was notified of the date, time and place of the hearing as well as the grounds for the adverse action taken against him. During the hearing on January 26, 2004, Dr. Curtsinger was represented by counsel and the fair hearing committee heard extensive testimony from several hospital staff members and physicians. Dr. Curtsinger was provided a copy of the recommendations resulting from the hearing on February 12, 2004.

However, Dr. Curtsinger does not challenge the sufficiency of the notice and hearing afforded to him after the second summary suspension, rather, Dr. Curtsinger contends that his alleged misconduct resulted in two separate professional peer review actions and thus, he was entitled to two separate investigations and two fair hearings. We addressed this same issue in *Peyton*, where the physician argued that his summary suspension and his subsequent permanent suspension were separate and distinct peer review actions warranting separate compliance with the provisions of 42 U.S.C. § 11112(a) in each instance. Said the Court:

> Dr. Peyton argues there were two distinct peer review actions which took place and the Hospital is, therefore, required to comply with the standards of § 11112 for each particular action. More specifically, Dr. Peyton asserts the summary suspension was a peer review action, and the subsequent permanent suspension was a separate and distinct peer review action. We need not decide whether these were two separate peer review actions or whether one is simply a continuation of the other. The issue can be resolved by looking to the plain language of § 11112(c)(2), which states that for purposes of § 11111(a), "nothing in this section shall be construed as ... precluding an immediate suspension or restriction of clinical privileges, subject to subsequent notice and hearing or other adequate procedures, where the failure to take such an action may result in an imminent danger to the health of an individual." This is exactly what happened in the present case. Dr. Peyton's hospital privileges were summarily suspended, and he was thereafter provided with the necessary protections set forth in the statute. In light of our conclusion above that the revocation of Dr. Peyton's privileges was undertaken in a reasonable belief "that the action was in the furtherance of quality health care", we must likewise conclude the summary suspension which occurred on April 24, 1994, was taken because the failure to do so may have resulted in an imminent danger to the health of an individual. 42 U.S.C. § 11112(c)(2).

*Peyton*, 101 S.W.3d at 88.

42 U.S.C. § 11112(c)(2) recognizes that certain actions, which may result in the imminent danger to the health of an individual, justify immediate suspension subject to subsequent notice and hearing. The MEC summarily suspended Dr. Curtsinger following his refusal to respond to three emergency room calls, which may reasonably have been expected to result in the imminent danger to the health of a patient. Dr. Curtsinger was thereafter afforded the necessary statutory protections provided in 42 U.S.C. § 11112(b). Therefore, based on *Peyton* and the provisions of 42 U.S.C. §

11112(c)(2), we find no merit in Dr. Curtsinger's contention that he was entitled to two separate investigations and hearings in order to fulfill the requirements of 42 U.S.C. § 11112(a)(3).

The final prong of the HCQIA immunity test provides that the peer review action must be taken "in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirements of paragraph (3)." 42 U.S.C. § 11112(a)(4). "Our analysis under § 11112(a)(4) closely tracks our analysis under § 11112(a)(1)." *Sugarbaker v. SSM Health Care*, 190 F.3d 905, 916 (8th Cir.1999). While Dr. Curtsinger challenges certain underlying facts upon which Defendants relied, he has not shown that the facts were "so obviously mistaken or inadequate as to make reliance on them unreasonable." *Mathews*, 87 F.3d at 638. In light of the evidence documenting Dr. Curtsinger's pattern of disruptive behavior and his alleged refusal to respond to three emergency room calls, we find that there is no genuine issue as to whether Defendants' action was taken in the reasonable belief that it was warranted by the facts.

Having failed to show by a preponderance of the evidence that Defendants did not comply with the four prong test provided in 42 U.S.C. § 11112(a), we affirm the decision of the trial court granting Defendants partial summary judgment pursuant to HCQIA and the Tennessee Peer Review Law.

## IV. INFORMATION SUPPLIED TO THE NATIONAL PRACTITIONER DATA BANK

Dr. Curtsinger lastly contends that the trial court erred in finding that the information supplied by Defendants to the National Practitioner Data Bank was sufficiently accurate and not made in bad faith or with malice. According to 42 U.S.C. § 11133(a)(1), "Each health care entity which takes a professional review action that adversely affects the clinical privileges of a physician for a period a longer than 30 days shall report [the action] to the [State] Board of Medical Examiners." The State Board of Medical Examiners is then required to report the same to the National Practitioner Data Bank. 45 C.F.R. § 60.9(b). 42 U.S.C. § 11137(c) protects healthcare entities who are required to issue professional review action reports by stating that, "[n]o person or entity ... shall be held liable in any civil action with respect to any report made under this subchapter ... without knowledge of the falsity of the information contained in the report." Therefore, healthcare entities "are entitled to immunity for reporting unless there is sufficient evidence for a jury to conclude that the report was false and the reporting party knew it was false." *Meyers v. Logan Mem. Hosp.*, 82 F.Supp.2d 707, 716 (W.D.Ky.2000).

Dr. Curtsinger claims that every statement in Defendants' report was false or should not have been reported. We therefore must review the record and the report provided to the National Practitioner Data Bank in order to determine whether there was evidence of knowing falsity. The report stated:

> Physician was suspended by the hospital medical executive committee for disruptive/inappropriate behavior involving patients, employees and physicians. Summary suspension was lifted contingent on physician's going on a leave of

-14-

absence and being evaluated by the state impaired physician's organization (Tennessee Medical Foundation or TMF). Physician cooperated with the TMF and applied for permission to end his leave and be reinstated to the hospital staff. While physician's request for reinstatement was pending, the MEC again suspended his privileges, based on reports of continued disruptive behavior. Physician requested a fair hearing. The hearing resulted in a determination by the MEC that the physician should not be reinstated to the staff, due to his disruptive behavior. Physician did not appeal the MEC's determination.

After reviewing the record, we find that Dr. Curtsinger failed to present any evidence, other than his own subjective belief, that the statements made to the National Practitioner Data Bank were false, much less that Defendants were aware that the statements were false. We therefore affirm the trial court's judgment, entitling Defendants to immunity for reporting the action of the peer review committee to the State Medical Board and the National Practitioner Data Bank.

## V. CONCLUSION

In considering the Motion for Summary Judgment in this case, we have followed the blueprint laid out for this Court by Judge Swiney in *Peyton*, 101 S.W.3d 76. Therein, this Court carefully explains the "unconventional" standard for summary judgment mandated by 42 U.S.C. § 11112(a) and universally followed in federal court decision. This "unconventional" standard was not mandated by the U.S. Congress in a vacuum. It represented a policy decision by Congress to encourage self-policing by healthcare professionals in response to what it determined to be a crisis.

When Congress passed the HCQIA in 1986, it was responding to a crisis in the monitoring of health care professionals. Although state licensing boards had long monitored the conduct and competence of their own health care workers, Congress found that "[t]he increasing occurrence of medical malpractice and the need to improve the quality of medical care have become nationwide problems that warrant greater efforts than those that can be undertaken by any individual State." 42 U.S.C. § 11101(1). Finding that incompetent "physicians find it all to[o] easy to move to different hospitals or states and continue their practices in these new locations," Congress mandated the creation of a national database that recorded incidents of malpractice and that was available for all health care entities to review when screening potential employees. H.R.Rep. No. 99-903, at 2, *reprinted in* 1986 U.S.C.C.A.N.6384, 6385 (hereinafter "H.R.Rep. No. 99-903"). Before passage of the HCQIA in 1986, threats of antitrust action and other lawsuits often deterred health care entities from conducting effective peer review. In order to encourage the type of peer review that would expose incompetent physicians, the HCQIA shields health care entities and individual physicians from liability for damages for actions performed in the course of monitoring the competence of health care personnel. *See Mathews v. Lancaster Gen. Hosp.*, 87 F.3d 624, 632 (3d Cir.1996) (describing

-15-

legislative history of the HCQIA); *Bryan v. James E. Holmes Reg'l Med. Ctr.*, 33 F.3d 1318, 1332 (11th Cir.1994) (listing Congressional motivations for passing the HCQIA).

    The HCQIA mandates that a health care entity's review of the competence of a physician shall not result in its liability "in damages under any law of the United States or of any State," if such a peer review "meets all the standards specified in section 11112(a) of this title." 42 U.S.C. § 11111(a).

*Singh v. Blue Cross/Blue Shield of Mass., Inc.*, 308 F.3d 25, 31 (1st Cir.2002) (footnote omitted).

As the *Singh* court stated in footnote:

    Since HCQIA immunity may only be overcome by a preponderance of the evidence, the statutory presumption in favor of the health care entity shifts to the plaintiff "not only the burden of producing evidence but the burden of persuasion as well." *See* Jerome A. Hoffman, *Thinking About Presumptions: The Presumption of Agency from Ownership as Study Specimen*, 48 Ala. L.Rev. 885, 896-97 (1997) (examining the "Thayer-Wigmore effect" and the "Morgan effect" of presumptions). Of course, a defendant moving for summary judgment on the basis of HCQIA immunity can choose to submit evidentiary material in support of its motion instead of relying solely on the evidentiary weight of the statutory presumption. That is a choice for the litigant.

308 F.3d at 33 n.5.

In the context of sustaining the grant of a summary judgement motion by the trial court, the U.S. Third Circuit Court of Appeals in *Brader*, 167 F.3d 832, stated:

    In this case, a physician who had been disciplined by his hospital sought to have a court revisit that adverse medical and administrative judgment. This is precisely the type of case that Congress intended to foreclose in passing the HCQIA. "[t]he intent of [the HCQIA] was not to disturb, but to reinforce, the preexisting reluctance of courts to substitute their judgment on the merits for that of health care professionals and of the governing bodies of hospitals in an area within their expertise." *Bryan*, 33 F.3d at 1337.

    We conclude that Brader has failed to rebut the presumption that AGH met the requirements for immunity under the HCQIA. He has failed to come forth with sufficient evidence to allow a reasonable jury to conclude that the Hosptial did not provide him with adequate and appropriate procedures, or that AGH did not act at all times in the reasonable belief that its actions would further quality health care. The grant of summary judgment to AGH will therefore be affirmed.

167 F.3d at 843.

As was the case in *Peyton*, Dr. Curtsinger has failed the "unconventional" summary judgment standard in this case.

Having found no merit in Appellant's assignments of error, we affirm the judgment of the trial court in all respects. The costs of appeal are assessed against Appellant, Dr. Curtsinger.


_____

WILLIAM B. CAIN, JUDGE